George Kent **WALLACE**, Petitioner,

v.

The **STATE** of Oklahoma, Respondent.

No. PC–95–1246.

Court of Criminal Appeals of Oklahoma.

March 18, 1997.

**85.** *McGregor v. State,* 885 P.2d at 1385.

Randy A. Bauman, Deputy Division Chief, Capital Post Conviction, Oklahoma Indigent Defense System, Norman, for Petitioner.

*ORDER DENYING POST–CONVICTION RELIEF, DENYING REQUEST FOR EVIDENTIARY HEARING AND DISCOVERY, AND DENYING REQUEST FOR EXTENSION OF TIME TO AMEND*

LUMPKIN, Judge:

Petitioner George Kent Wallace through post-conviction counsel has filed a "Revised Initial Application for Post–Conviction Relief, Request for Extension of Time to Amend,

and Request for Discovery and Evidentiary Hearing." Petitioner entered a plea of guilty to two counts of Murder, First Degree, in the District Court of LeFlore County in Cases No. CRF–91–1 and CRF–91–2. Petitioner waived his right to direct appeal; and on mandatory sentence review, this Court affirmed the judgments and sentences in each case. Certiorari was denied by the United States Supreme Court. *Wallace v. State*, 893 P.2d 504 (Okl.Cr.), *cert. denied*, —— U.S. ——, 116 S.Ct. 232, 133 L.Ed.2d 160 (1995). Before filing his Application for Post–Conviction Relief, Petitioner filed a motion for discovery, which this Court denied, holding we had no jurisdiction at that time to grant discovery in his case. *Wallace v. State*, 910 P.2d 1084 (Okl.Cr.1996). Petitioner then filed an Application for Post–Conviction Relief on June 3, 1996. This Court on June 19, 1996, issued an unpublished order granting additional time to comply with the Rules of this Court, as the argument and authorities section of his application exceeded 50 pages. *See Rules of the Court of Criminal Appeals,* Rule 9.7(A)(4), 22 O.S.Supp.1996, Ch. 18 App. Petitioner filed his revised Application on July 9, 1996.

In his revised Application, Petitioner has presented eight grounds for relief: (1) that his appointed counsel suffered from conflicts of interest impermissible under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and similar provisions of the Oklahoma Constitution; (2) ineffective assistance of trial counsel and/or failure of the State to disclose exculpatory information, combined with inaccurate information provided by state officials, deprived Mr. Wallace's sentencer of mitigating evidence vital to an accurate determination of sentence; (3) trial counsel's failure to investigate Mr. Wallace's death wish and counsel him against death constituted ineffective assistance; (4) Mr. Wallace was deprived of the *Ake* expert to which he was entitled in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; (5) the competency determination in Mr. Wallace's case is constitutionally defective under the Eighth and Fourteenth Amendments; (6) the trial court lacked subject matter jurisdiction to convict and sentence Mr. Wallace; (7) to any extent issues presented on direct appeal were deemed waived or any issues in this application are deemed waived or barred, previous counsel was ineffective for not preserving them, in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution; and (8) the trial court violated Mr. Wallace's federal and state constitutional rights when it declined to apply a rule of criminal law, decided in his case, to him.

### I.

Petitioner has also presented a preliminary complaint, that the new capital post-conviction regime, on its face and as applied, denies both adequate and equal access to the courts and deprives Petitioner of due process, all in violation of the Sixth, Eighth, and Fourteenth amendments to the United States Constitution, the Ex Post–Facto Clause of that document, and similar provisions of the Oklahoma Constitution. We addressed this issue in *Hatch v. State*, 924 P.2d 284 (Okl.Cr. 1996), and found no merit to it. We need not address it again.

### II.

■ For his first proposition, Petitioner complains his court-appointed counsel suffered from an impermissible conflict of interest. Petitioner admits this claim is presented for the first time in post-conviction proceedings. The amended version of Section 1089 is very specific as to the scope of claims which can be raised in post-conviction application:

C. The only issues that may be raised in an application for post-conviction relief are those that:

1. Were not and could not have been raised in a direct appeal; and

2. Support a conclusion either that the outcome of the trial would have been different but for the errors or that the defendant is factually innocent.

22 O.S.Supp.1995, § 1089(C). It is a well established rule of statutory construction that statutes are to be construed according to the plain and ordinary meaning of their lan-

guage. 25 O.S.1991, § 1. *See also Virgin v. State*, 792 P.2d 1186, 1188 (Okl.Cr.1990); *Parker v. State*, 424 P.2d 997, 1000 (Okl.Cr. 1967). "A statute must be held to mean what it plainly expresses and no room is left for construction and interpretation where the language employed is clear and unambiguous." *Abshire v. State*, 551 P.2d 273, 274 (Okl.Cr.1976). The use of the conjunctive "and" between the two parts of this subsection indicate both portions must be present before this Court can review a claim.

In the case *sub judice*, Petitioner was afforded an opportunity to pursue a direct appeal; he specifically declined to do so. *Wallace*, 893 P.2d at 509–10.[1] As a result, he is bound by that earlier decision; as a consequence of that decision, he has forfeited his right to have this Court consider the issue of his trial counsel's alleged conflict, which would have been readily available for that direct appeal. Accordingly, Petitioner's first proposition is waived.

### III.

In his second proposition, Petitioner claims ineffective trial counsel, combined with failure of the prosecution to disclose exculpatory information and inaccurate information provided by State officials, deprived him of mitigating evidence vital to the court's determination of his sentence. In this vein, Petitioner first claims there was ample evidence in mitigation which trial counsel did not find, because he did not seek it. This argument could have been presented on a direct appeal, which Petitioner waived. This portion is therefore waived for review here. 22 O.S.Supp.1995, § 1089(C). Waived on the same grounds is Petitioner's claim his waiver of the presentation of mitigating evidence was not knowing, intelligent and voluntary.

Petitioner also claims exculpatory evidence was available, but not turned over to him or trial counsel. In support of this, he cites "the report of the interview with Kenny Williams and the information still retained by Sheriff Grimes." Brief at 22–23. Petitioner does not cite to the record or supplemental materials where this information is contained. He provides no other examples. Accordingly, he has waived this portion of his claim for review. *See Rules of the Court of Criminal Appeals*, Rule 9.7(A)(3)(g), 22 O.S.Supp.1996, Ch. 18 App.[2]

Accordingly, this proposition is likewise waived.

### IV.

For his third proposition, Petitioner again claims trial counsel was ineffective, this time for failing to investigate his death wish and to counsel him against desiring the death penalty. This, too, is waived, as it could have been presented on a direct appeal. 22 O.S.Supp.1995, § 1089(C).

### V.

For his fourth proposition, Petitioner claims he was deprived of an expert psychiatrist to which he was entitled under *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). He admits this claim has not been raised before. As a consequence, it is waived, as it could have been presented on a direct appeal. 22 O.S.Supp.1995, § 1089(C).

Further, we are confused by Petitioner's seemingly contradictory argument. At one point he cites to a transcript made before judgment and sentence was passed as support for his claim that an *Ake* request was made, while at the same time admitting the language in the record to which he cites as

---

1. This Court conducted a mandatory sentence review as required by *Grasso v. State*, 857 P.2d 802, 805 (Okl.Cr.1993).

2. This Court gave Petitioner time to file a new Application and argument and authorities section to comply with this Court's rules. Petitioner did so, submitting a revised application. It is this revised argument and authority section, which should (but does not) refer to his supplemental materials in Appendix 2, to which we look for citations. Materials in Appendix 2 were reviewed, as were all documents properly before this Court. Still, this Court is under no obligation to review the entire record to find materials; if Petitioner deemed them important enough to incorporate into his Application, he should deem them important enough to warrant a specific reference; a "kitchen sink" reference is not sufficient. *See Rules of the Court of Criminal Appeals*, Rule 3.5, 22 O.S.Supp.1996, Ch. 18 App.

authority was "less than ideal."[3] He then alleges the claim "relies on extra-record evidence," brief at 29, while not telling this Court what that evidence is. He therefore has failed to adequately show this Court that such a request was even made under *Ake. See Rules of the Court of Criminal Appeals,* Rule 9.7(A)(3)(g), 22 O.S.Supp.1996, Ch. 18 App.

This proposition is likewise waived.

## VI.

■ For his fifth proposition of error, Petitioner alleges he was determined to be competent under an unconstitutional standard. This Court addressed this proposition of error in Petitioner's mandatory sentence review, finding it invalid under *Cooper v. State,*

3. Brief at 28. To interpret counsel's request in the context of an *Ake* expert as being "less than ideal" is an understatement. We acknowledge post-conviction counsel's creativity in attempting to make this square peg fit into a round hole; however, we feel compelled to note for the record that, in context, counsel was simply requesting that someone other than a mental health technician conduct a competency examination. We need not address that argument, either: another competency evaluation was conducted later, by the type of person counsel requested at the first hearing. Therefore, even were it not waived, it would have been rendered moot by the district court's subsequent actions.

4. But even if the legal basis for the claim were not *res judicata*, we could not grant Petitioner relief, as his competency to stand trial was never factually controverted. In Petitioner's mandatory sentence review, we remarked that there was "never any real question of his competency," *Wallace*, 893 P.2d at 516. Rather, we determined "the court took extra precautions to ensure that the guilty plea Appellant had announced he was going to enter could withstand the intense scrutiny that accompanies all capital cases." *Id.* We also added that "[u]nder whatever standard by which this Court would choose to evaluate him, the evidence—in both competency hearings, during his guilty plea and sentencing—showed unequivocally Appellant was competent, as he had a rational understanding of the nature of the charges against him and was able to consult with his attorney with a reasonable degree of rational understanding." *Id.*

Such an observation is supported by the record. In the January 30, 1991, hearing, defense counsel requested the hearing stating he "harbor[ed] some doubts as to whether or not my client truly understands the gravity of this situation." The prosecutor observed the application conformed with applicable statutes, but added:

889 P.2d 293 (Okl.Cr.1995). The Supreme Court of the United States reversed that case, holding a due process violation occurred when an appellant was required to prove by clear and convincing evidence he was not competent to stand trial. *Cooper v. Oklahoma,* —— U.S. ——, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996).

■ Again, we find we cannot address this proposition. Subsection (C)(1) of Section 1089 specifically states the only issues which can be raised on post-conviction relief are those which were not and could not have been raised on direct appeal. Petitioner raised this claim on direct appeal; accordingly, it is *res judicata*, and we cannot address it again.[4]

"However, so far as the State is concerned, I want the record to be totally clean in so far as we're concerned in that I do understand the Court's position in having to proceed with the competency part of this proceeding. However, it is the State's position without equivocation that this defendant is competent to stand trial for these charges." That sets the tone of the entire record which followed.

At the hearing on February 4, 1991, Petitioner himself called the mental health technician who conducted the examination. When asked if she could be "sure, to a reasonable scientific certainty, that Mr. Wallace is competent to stand trial," she answered in the affirmative. When asked if she was "sure," she again replied "yes." When cross-examined by the prosecutor, she said she found nothing to indicate Petitioner did not understand the nature of charges, or could not assist his attorney. When asked: "And in your own mind, there was not any doubt that that conclusion [Petitioner was competent] is the right conclusion," she replied "no doubt." Petitioner made no attempt to question these findings.

After hearing from an investigator who talked with Petitioner, and then overruling defense counsel's request that Petitioner be examined by a board certified psychiatrist or psychologist at Eastern State Hospital, the court made the following observation:

"And again, I'm following the statute. It says that—and this is 1175.5. The jury or the Court, as the case may be, shall answer the following questions in determining the disposition of the person whose competency is in question. [questions]. It says if the answer is no, criminal proceedings shall be resumed. And based on the evidence I've heard, based on the report filed by Mrs. Glasco, my answer to that question is, no, the person is not incompetent...." (2–4 Tr. 28–29).

This, standing alone, does not support Petitioner's argument; and that which follows weakens

## VII.

 In his sixth proposition of error, Petitioner claims the trial court lacked subject matter jurisdiction to convict and sentence him. He alleges, correctly, that both crimes charged were committed very near the Arkansas–Oklahoma state line; he also alleges, correctly, that even though not raised on direct appeal, issues of subject matter jurisdiction are never waived and can therefore be raised on a collateral appeal. *Johnson v. State*, 611 P.2d 1137, 1145 (Okl.

the argument even more. The hearing which followed proved Petitioner did not question his competency, and made no attempt to advance evidence to show he was incompetent.

After being told that Petitioner would eventually plead guilty to the charges and observing that he could receive the death penalty, the court stated he felt

compelled to order a complete psychological evaluation of this Defendant. I am aware that a competency hearing on an outpatient basis was held in this case and that he has been found to be competent by a technician of the Carl Albert Mental Health Center, but due to the possible consequences of a plea and of the State's proving their case on their Bill of Particulars, I need to be certain as I humanly can be certain as to this man's competence to proceed any further. The statute says that the Court may institute this proceeding on its own motion, and I am doing that at this time. I am not saying that I doubt this man's competence. Before you can doubt someone's competence you have to know them and have been around them. This is the first time I have ever seen Mr. Wallace. So I don't—I'm not saying that I doubt his competence, but what I am saying is that I must be sure as I can be before I can proceed with these proceedings. (2–21 Tr. 4).

The court reiterated its concerns a short time later when he said:

"Again, for the record, I want the record to be perfectly clear about this. I am doing this for the purpose of being as certain as we can be as to this Defendant's competency before we proceed any further. The reason being that his attorney has announced today with his approval that he intends on changing his plea from not guilty to guilty in these two matters, that in each case the State has filed a Bill of Particulars and that if they are able to meet their burden of proof on these items that they allege in that, that he could receive the death penalty. And I am doing this out of an abundance of precaution, an overabundance of precaution, perhaps, but I feel that it's something that should be done." (2–21 Tr. 8–9).

At the beginning of the hearing itself, the court asked either side if it took issue with the report finding Petitioner competent. Each side replied he did not. When asked if he had discussed the report with his client, defense counsel stated:

Your Honor, I have discussed with Mr. Wallace not only the contents of the report which he's had an opportunity to review, also the fact that at this juncture he is entitled to a trial by jury on this question if he desires. He's indicated to me that he desires to waive that, and have the Court hear any evidence and make any rulings necessary on this particular stage of the proceedings. (3–11 Tr. 3).

The court questioned Petitioner himself, who stated his attorney's observations were correct. (3–11 Tr. 3–4). After the prosecution questioned Dr. Jeanne Russell, who conducted the evaluation and found Petitioner competent, defense counsel made the following statement when asked if he wished to cross-examine:

May I have a moment, Your Honor. Your Honor, I've conferred with Mr. Wallace, and Dr. Russell has established his competence. As I stated at our last hearing, we have never thought that was an issue at this point. So after conferring with Mr. Wallace, I have no questions of the doctor. (3–11 Tr. 11).

From this, this Court can gather only one conclusion: Petitioner's competency was never really in doubt. Rather, the court ordered the proceedings in each instance to be held out of an overabundance of caution. Further, as Petitioner's attorney made clear in the second hearing, the defense "never thought [Petitioner's competency] was an issue." Given that Petitioner never seriously asserted competency as an issue, and in fact did not question any of the findings in the second proceeding, we can safely say that he never made any attempt to rebut the presumption of competency under any standard, constitutional or otherwise. *See also* 3–11 Tr. 16–18 (where it appears the trial court may have placed the burden on the prosecution, not on Petitioner). Therefore, Petitioner was never placed in the position of being required to meet an improper burden of proof. That being the case, whether Petitioner might have been required to rebut the presumption of competency by clear and convincing evidence or merely by a preponderance of the evidence is not an issue, and any perceived due process error would be harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *see also Carella v. California*, 491 U.S. 263, 266, 109 S.Ct. 2419, 2421, 105 L.Ed.2d 218 (1989) (jury instruction containing an erroneous conclusive presumption); *Pope v. Illinois*, 481 U.S. 497, 501–504, 107 S.Ct. 1918, 1921–1923, 95 L.Ed.2d 439 (1987) (jury instruction misstating an element of the offense); *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (jury instruction containing an erroneous rebuttable presumption); *Hopper v. Evans*, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) (statute improperly forbidding trial court's giving a jury instruction on a lesser included offense in a capital case in violation of the Due Process Clause).

Cr.1980), *cert. denied,* 449 U.S. 1132, 101 S.Ct. 955, 67 L.Ed.2d 120 (1981). He now alleges the crimes occurred in Arkansas, claiming (1) the border location is disputed by local officials and surveyors; (2) authorities from both states responded to the crime scene; (3) the body in at least one case was dragged away from the Arkansas side of the border; (4) the bodies were very near the border; and (5) the police determination that the crimes were committed in Oklahoma was apparently based upon where the bodies were found, not where the fatal wounds were inflicted. Petitioner requests additional discovery, after which he expects to establish that one or both of these homicides occurred in Arkansas. Based on the record provided by Petitioner's counsel, we disagree.

We initially note the absence of cases dealing with this subject. We have been unable to find any cases dealing with which state should exercise sovereignty over a homicide committed in an area where the boundary between states is in question. This Court has never dealt with the issue directly. However, in *Howe v. State,* 669 P.2d 780, 782 (Okl.Cr.1983), we addressed the issue raised when the location of the murder itself was questioned. In that case, the appellant was convicted of murder in Cleveland County, Oklahoma. The victim was last seen alive leaving a lounge in Dallas, Texas, in the early morning hours of June 18, 1981. The body was found in an Oklahoma City field June 19. The appellant was apprehended in Tulsa June 25, driving the victim's automobile. Evidence in the car linked it to the homicide. Appellant, a former employee of the Texas lounge owned by the victim, was fired by the victim several months before the homicide. Two witnesses testified they had heard the appellant threaten the victim's life; another testified that on the day he was fired, the appellant assaulted the victim. On appeal, the appellant contended the evidence was insufficient to establish that jurisdiction of the offense rested in an Oklahoma court. This Court cited 22 O.S.1981, § 121, which places jurisdiction in the state wherein the offense is consummated. We held that "as there was competent, albeit circumstantial, evidence from which the jury could conclude that the offense charged was consummated

in Oklahoma, we will not, on appeal, interfere with the verdict," citing to *Renfro v. State,* 607 P.2d 703 (Okl.Cr.1980).

We think the same rationale applies here. The evidence shows that, although Arkansas authorities initially began working the homicides, they turned the investigation over to Oklahoma authorities. This indicates a knowledge by both Arkansas and Oklahoma authorities that the homicides occurred in Oklahoma.

Additionally, Petitioner's own evidence, submitted as exhibits in support of the affidavit for an evidentiary hearing, indicates both homicides occurred in Oklahoma. Petitioner told authorities he took Domer to the far right-hand corner of the cemetery. He indicated he was driving down Texas Road. An examination of the maps, aerial photographs and diagrams provided by Petitioner shows Texas Road angles from the northeast in Arkansas to the southwest in Oklahoma (Exhibits 5A & 5B, App. 2, Ex. 18). When taking that route, the far right-hand side (to the driver) would be the southwest corner of the cemetery; or, if the driver were facing east, the corner would be the southeast corner. In either case, it would not be the northeast corner, the corner Petitioner claims the death occurred in and the corner he claims lies in Arkansas. This evidence indicates the land was in Oklahoma.

But even discounting this analysis, the evidence still shows the homicides occurred in Oklahoma. The materials detailing the border provided by Petitioner in support of his affidavit for an evidentiary hearing state that "[t]he western boundary of Arkansas shall be, and the same, is hereby defined, viz: A line shall be run, commencing on Red River, at the point where the Eastern Choctaw line strikes said river, and run due north with said line to the river Arkansas; thence in a direct line to the South West corner of Missouri." (Exh. 23).

This becomes important when viewed in relationship to disputed areas of the boundary:

(1) On the Arkansas side of the boundary near where the homicides occurred, the area is labeled as Township 7 North.

(2) North of the site of the homicides, Township 8 North begins. The distance from the site of the homicides to the beginning of Township 8 North is just over one mile.

(3) Townships 8 and 9 North (comprising Forth Smith) were the subject of a boundary dispute between Oklahoma and Arkansas. *Oklahoma v. Arkansas*, 473 U.S. 610, [610–11] 105 S.Ct. 3519, 3520, 87 L.Ed.2d 441 (1985).[5]

(4) The Supreme Court read the legal description of the boundary setting the western boundary of Arkansas as follows:

> The Western boundary of Arkansas shall be, and the same is, hereby defined, viz: A line shall be run, commencing on Red River, at the point where the Eastern Choctaw line strikes said River, and run due North with said line to the River Arkansas, thence in a direct line to the South West corner of Missouri.

*Id.* at 610–11, 105 S.Ct. at 3520. This is the same description given in the Arkansas Constitution, as provided in the materials by Petitioner. In 1905, Congress gave Arkansas authority to extend the line westward. *Id.* at 611–612, 105 S.Ct. at 3520. As the materials provided by Petitioner state, "[t]his change added about one-fifth of a square mile to the area of Arkansas." (Exh. 23). "[T]he disputed tract became part of the State of Arkansas in 1905 by the joint action of the Congress of the United States and the State of Arkansas, and remains so to this day." *Id.* at 612, 105 S.Ct. at 3521.

(5) The opinion also states:

> *The parties stipulated that the State of Arkansas has exercised continuous sovereignty, dominion, control, and exclusive criminal and civil jurisdiction over the disputed tract since the enactment of Act No. 41 by the Arkansas Legislature on February 16, 1905;* that Sebastian County, Arkansas, has continuously levied and collected real property taxes within the disputed tract; and that Le Flore County, Oklahoma has never levied or collected taxes within the disputed tract.

*Id.* (emphasis added).

(6) Appendix 5(A), submitted by Petitioner, is a map depicting the South Fort Smith Quadrangle. The map, which contains the site of both homicides, was edited in 1987, two years after the Supreme Court rendered its decision in the boundary dispute. The topographic map, produced by the United States Geological Survey, states that it "complies with national map accuracy standards."

(7) This map shows a continuous, unbroken and uncurved boundary clear up to the Arkansas River, just west of Fort Smith. The boundary does intersect the pond where the bodies were found; but only the far easternmost portion of the pond lies in Arkansas.[6]

(8) This boundary is also illustrated in aerial photographs provided by Petitioner as Appendix 5(B). The aerial photographs reflect that a trail runs from the Leard Cemetery south to the pond. This is the trail described by Petitioner as the place he killed Domer. It lies well within the Oklahoma side of the boundary.

(9) In describing the McLaughlin murder, Petitioner told authorities he drove to the south side of the pond, the opposite side from where he shot Domer. He told authorities he pulled off on a side road which ran along the south edge of the pond. This road is shown in the aerial photographs, and is depicted in the topographical map. He told authorities he pulled about halfway down the road, where he stopped, spanked McLaughlin, took him out of the car, and shot him approximately 15 feet from the car. Both these exhibits place the road described by Petitioner en-

---

5. Petitioner failed to provide this Court with this case.

6. On the topographical map, the shape of the pond at the east end (the Arkansas side) appears different from the shape of the pond in the aerial photographs. However, on closer inspection, one can see a depressed area on the Arkansas side which indicates where the surface of the water used to extend. The outline corresponds very closely to the shape of the pond shown on the map. It seems obvious the aerial photographs were taken when the pond level was low.

tirely in Oklahoma. Even if Petitioner was mistaken, and pulled down the road more than halfway, both the map and the aerial photographs indicate he would not have been in Arkansas; rather, he would have been in Oklahoma.

This evidence amply provides sufficient facts from which any factfinder could conclude that the murders occurred in Oklahoma, and not in Arkansas. The disputed border, less than two miles north of the homicide scene, blends with the border near the homicide scenes in a smooth, unbroken, unbent line. Given this, and given that Petitioner's submitted topographical map showing the boundary between the two states was edited two years after the Supreme Court rendered its decision, we find the murders occurred in Oklahoma and not in Arkansas. Petitioner has failed to make the threshold showing as required by Rule 9.7(D)(5) to warrant an evidentiary hearing on this issue. *See also* 22 O.S.Supp.1995, § 1089(D)(5). Accordingly, Petitioner's sixth proposition of error is without merit.

## VIII.

 For his seventh proposition of error, Petitioner claims appellate counsel was ineffective for failing to raise issues we have deemed are waived under the revised Section 1089. This Court in *Walker v. State*, 933 P.2d 327 (Okl.Cr.1997) recently interpreted 22 O.S.Supp.1995, § 1089(D)(4) in arriving at a standard to determine whether appellate counsel was ineffective. Under that standard, a petitioner must first prove (1) that appellate counsel actually committed the act which gives rise to the claim of ineffective appellate counsel. If we find counsel did so, we then ask (2) whether such performance was deficient under the first prong of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). If we find the attorney's performance was deficient, we then ask (3) whether the claim meets the second prerequisite to capital post-conviction review, i.e., whether it supports a claim either that the outcome of the trial would have been different but for the errors or that the

petitioner is factually innocent.[7] *Walker*, 933 P.2d at 333–34. In so doing, we continue to observe the principle that proving attorney ineffectiveness is no easy task, and the burden is on the petitioner to set forth sufficient facts and law to enable this Court to fully assess appellate counsel's allegedly deficient performance. *Id.*

We find the first prong is met. Appellate counsel failed to raise the claim on direct appeal. We now turn to the second claim.

Here, as in *Walker*, Petitioner makes a bald allegation that counsel failed to raise what he considers a meritorious claim, implying this is sufficient to show appellate counsel's performance was deficient. However, we noted in *Walker* that under the new statute, more is needed. We held that capital post-conviction petitioners must devote much greater time and attention to what counsel did or did not do and why counsel's acts or omissions constituted deficient performance. *Id.* at 333–34. Furthermore, we observed the mere conclusory allegation that appellate counsel failed to raise an arguably meritorious claim, standing alone, will never support a finding that an attorney's performance was deficient. *Id.* at 336–37.

Here, Petitioner has failed to support his claim with facts other than the mere allegation his appellate counsel failed to raise the claim. This is insufficient.

There is also another aspect in connection with this case that we feel obliged to address. At the risk of being redundant, we must again note that Petitioner waived his direct appeal. He appeared quite emphatic about that, maintaining that desire even after this Court remanded his case to the district court to make a determination on the issue. *Wallace*, 893 P.2d at 509. As a result of that irrevocable decision, this Court conducted a mandatory sentence review only. Therefore, there is no guarantee that, even had appellate counsel raised the issues Petitioner now raises, this Court would have found they properly came under a mandatory sentence review.

---

7. This writer continues to maintain that this standard is an incorrect standard to use in reviewing a claim of ineffective appellate counsel in a post-conviction application. *See Walker*, 933 P.2d at 341–42 (Lumpkin, J., concurring in result). However, I yield to *stare decisis*.

For these reasons, this claim is without merit.

## IX.

■ For his eighth and last proposition of error, Petitioner claims this Court violated his rights by declining to apply a rule of law, decided in his case, to him. In the opinion on Petitioner's mandatory sentence review, this Court established rules to be followed in those instances where a defendant wishes to waive his right to present mitigating evidence. Quoting from *Grasso v. State*, 857 P.2d 802, 806 (Okl.Cr.1993), we said the trial court will allow a defendant to forego a state appeal "only if he has been judicially determined to have the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all rights to appeal his sentence." *Wallace*, 893 P.2d at 512. We said that was the "basic standard" we would use in determining whether a defendant could waive his right to present mitigating evidence. *Id.*

Toward that end, the court must ensure the defendant has an understanding of his or her rights both in the plea process and in the sentencing process:

(1) The court must inform the defendant of the right to present mitigating evidence, and what mitigating evidence is.

(2) The court must inquire both of the defendant and his attorney (if not pro se) whether he or she understands these rights.

(3) The court should also inquire of the attorney if he or she has attempted to determine from the defendant whether there exists any evidence which could be used to mitigate the aggravating circumstances proven beyond a reasonable doubt by the prosecution.

(4) If such information has been given, the attorney must advise the court what that mitigating evidence is; if the defendant has refused to cooperate, the attorney must relate that to the court.

(5) The trial court must inquire of a defendant and make a determination on the record whether the defendant understands the importance of mitigating evidence in a capital sentencing scheme, understands such evidence could be used to offset the aggravating circumstances proven by the prosecution in support of the death penalty, and the effect of failing to present that evidence.

(6) After being assured the defendant understands these concepts, the court must inquire of the defendant whether he or she desires to waive the right to present such mitigating evidence.

(7) Finally, the court should make findings of fact pursuant to *Grasso* of the defendant's understanding and waiver of rights.

*Id.* at 512–13. This Court in Petitioner's case made the basic determination Petitioner had the capacity to understand the choice between life and death and to knowingly and intelligently waive all rights to present mitigating evidence. Petitioner knew what mitigating evidence was, as his attorney discussed it with him. He likewise knew he had the right to present mitigating evidence. Petitioner refused to cooperate with his attorney in the presentation of mitigating evidence; indeed, Petitioner would not even let his attorney cross-examine prosecution witnesses during the sentencing hearing. The trial court ordered more than one competency hearing before being satisfied Petitioner knew what he was doing, and even ordered a pre-sentence investigation in an attempt to obtain all the evidence he could before sentencing Petitioner to death.

In short, although the trial court did not specifically follow each of the requirements we set forth in Petitioner's case, there was little question the court substantially complied with these enumerated guidelines and made the basic determination Petitioner understood the nature of mitigating evidence, understood the choice between life and death, and knowingly and intelligently waived all his rights to present mitigating evidence.

Accordingly, Petitioner's eighth proposition has no merit.

## X.

We next address Petitioner's motions for discovery. He claims "broad discovery" is

provided for by 22 O.S.Supp.1995, § 1089(D)(3). We addressed this allegation in *Hatch*, 924 P.2d at 284, where we held "this Court does not have the authority to grant general discovery requests absent a showing the request is related to an issue which could not have been raised within the scope of Section 1089." *Id.* at 295.

■ We also addressed in *Hatch* the same request Petitioner raises here in his second proposition of error, that a *Brady* violation occurred. In *Hatch*, as here, the petitioner discussed this generally in his argument as to the scope of discovery. We found it to be without merit. *Id.* at 296. Here, as there, Petitioner has failed to produce an affidavit specifically alleging any reason to believe such a violation occurred. Accordingly, for the same reasons as in *Hatch*, the request is denied.

■ Petitioner also seeks discovery related to his first claim, that his trial attorney had a conflict of interest. Again, we must observe Petitioner specifically waived his direct appeal. Several items Petitioner now seeks relate to issues which could have been raised on direct appeal but which, by Petitioner's own wishes, were not. Since the issue itself would not be a proper part of a post-conviction proceeding, 22 O.S.Supp.1995, § 1089(C), *see also Berget*, 907 P.2d at 1084, discovery as it relates to those issues is not a proper matter for this Court's consideration. We find the Legislature in enacting the new version of Section 1089 did not intend to allow discovery for an issue which this Court is precluded from considering. Accordingly, we deny Petitioner's request for discovery as it relates to his first proposition.

Petitioner also requested this Court to authorize interrogatories in connection with these claims. For the reasons given above, this request, too, is denied.

Having concluded there is no right to general discovery absent Legislative approval; having reviewed all of Petitioner's specific discovery requests; and having found no ba-

sis for any of those requests, his request for discovery is denied.

## XI.

Petitioner also included a request for an evidentiary hearing, to be held following the completion of discovery, and opportunity for final amendment of his Application.[8] He claims an evidentiary hearing is necessary to the extent any factual contentions are in doubt.

■ The same rationale we applied in section X, above, and in *Hatch*, also applies here. If a claim is not within the scope of issues this Court is capable of reviewing under 22 O.S.Supp.1995, § 1089(C), this Court is without authority to order a hearing on the issue. Having determined this Court has no authority to order a hearing on the issue, we find it unnecessary to rule whether Petitioner has alleged sufficient facts to meet the threshold requirement for such a hearing under Rule 9.7(D)(5). Accordingly, Petitioner's request for an evidentiary hearing on his First, Second, Third, Fourth, Sixth, and Eighth Propositions is denied.

Concerning Petitioner's Seventh Proposition, that his counsel during mandatory sentence review was ineffective, we have determined the issue to be without merit based on the record before us. Consequently, no hearing is needed on this issue. 22 O.S.Supp.1995, §§ 1089(D)(4) & (5). The same is true of Petitioner's Fifth Proposition, that an unconstitutional standard was used to determine his competency.

## XII.

For the reasons given above, Petitioner's Application for Post–Conviction Relief is DENIED. Also for the reasons given above, Petitioner's requests for further discovery and an evidentiary hearing are DENIED. Petitioner's request for leave to amend his Application is not properly before us, and is hereby DENIED.

---

8. We need not address the request for a final amendment of his Application, as that issue is not before us. We would, however, call Petitioner's attention to 22 O.S.Supp.1995, § 1089(D)(2), which prohibits amendments or supplemental materials after the required time for filing the Application.

## AN ORIGINAL PROCEEDING ON AN APPLICATION FOR POST-CONVICTION RELIEF

GEORGE KENT WALLACE, Petitioner, presents to this Court an Application for Post–Conviction relief. Petitioner entered a plea of guilty to two counts of Murder in the First Degree in the District Court of Le-Flore County, Case Nos. CRF–91–1 and CRF–91–2. Following a hearing on sentencing, Petitioner was sentenced to death on each count. As Petitioner waived his right to a direct appeal, and as he did not follow proper procedure in seeking to withdraw his plea, this Court conducted a mandatory sentence review and affirmed the judgments and sentences of the district court. Certiorari was denied by the Supreme Court of the United States. *Wallace v. State*, 893 P.2d 504 (Okl.Cr.), *cert. denied*, —— U.S. ——, 116 S.Ct. 232, 133 L.Ed.2d 160 (1995). Relief denied.

CHAPEL, P.J., and JOHNSON, J., concur.

Strubhar, V.P.J., and LANE, J., concur in result.

CHAPEL, Presiding Judge, concurring:

I concur in the Court's decision denying Wallace's Application. Traditionally in Oklahoma, on post-conviction review, a defendant has received the benefit of intervening changes in the law. The revised post-conviction statute changed that general rule.[9] Moreover, this Court has recently determined that the issue of the appropriate standard for determination of competency under *Cooper v. Oklahoma*[10] is not a new rule of constitutional law.[11] Therefore procedural bars may apply to these claims on post-conviction. Our resolution of Wallace's Proposition V acutely illustrates the harsh result which may occur when the principle of finality of judgment is applied. However, our new

post-conviction statute dictates the strict application of that principle.

---

**9.** 22 O.S.Supp.1995, § 1089(D)(9)(a) & (b).

**10.** —— U.S. ——, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996).

**11.** *Walker v. State*, 933 P.2d. 327, 339–41 (1997).