2004 OK CR 24

**John Marion GRANT, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. D 2000–653.**

Court of Criminal Appeals of Oklahoma.

July 16, 2004.

William H. Luker, Appellate Defense Counsel, Norman, OK, Attorney for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Brant M. Elmore, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.

**OPINION ON REMAND**

LILE, Vice Presiding Judge.

¶ 1 John Marion Grant was tried by jury and convicted of First Degree Murder (21 O.S.1991, § 701.10) in Osage County District Court Case No. CF–99–28. The jury sentenced Grant to death after finding three aggravating circumstances. This Court affirmed the judgment and sentence. *Grant v. State*, 2002 OK CR 36, 58 P.3d 783. Grant subsequently filed an application for post conviction relief, which was denied.[1]

¶ 2 In *Grant v. Oklahoma*, — U.S. —, 124 S.Ct. 162, 157 L.Ed.2d 12 (2003), the United States Supreme Court granted Grant's petition for writ of certiorari, vacated the judgment, and remanded the case back to this Court for further consideration in light of *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). This Court ordered the parties to submit briefs supporting their positions on the issues raised in this case in light of the *Wiggins* decision, which was handed down after our decision in Grant's direct appeal.[2] This opinion supplements our original opinion, *Grant*, 2002 OK CR 36, 58 P.3d 783, with analysis based on the *Wiggins* decision.

¶ 3 In *Wiggins v. Smith*, the United States Supreme Court applied the well established standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1994):

"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense."

*Wiggins*, 539 U.S. at —, 123 S.Ct. at 2535. We utilized the same test in the present case. *Grant*, 2002 OK CR 36, ¶ 81, 58 P.3d at 799.

■ ¶ 4 *Wiggins* illustrates the need to partake in reasonable investigation before making strategic choices, because

"strategic choices made after thorough investigation of law and facts ... are virtually unchallengeable; and strategic choices

---

1. Oklahoma Court of Criminal Appeals Case No. PCD–2002–347.

2. We reviewed supplemental briefs filed by the parties in this case; Appellant's brief filed on December 22, 2003 and Appellee's modified brief filed on February 4, 2004.

made after less than complete investigation are reasonably precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins,* 539 U.S. at ——, 123 S.Ct at 2535, *citing Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066.

¶ 5 Wiggins claimed, "that his attorneys' failure to investigate his background and present mitigating evidence of his unfortunate life history at his capital sentencing proceedings violated his Sixth Amendment right to counsel." *Wiggins,* 539 U.S. at ——, 123 S.Ct at 2531. The Supreme Court in reversing Wiggins' conviction relied on well established law that "[I]n an ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins,* 539 U.S. at ——, 123 S.Ct at 2535.

¶ 6 The facts and circumstances of *Wiggins* are diametrically opposed to the facts and circumstances of Grant's case. Wiggins had no prior criminal history, and at trial, counsel introduced no evidence of Wiggins' life history or family background. Counsel in *Wiggins* completely failed to discover that, "Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." *Wiggins,* 539 U.S. at ——, 123 S.Ct at 2542. In Grant's case, counsel allowed Grant to testify about his early childhood, and Grant specifically told counsel that he did not want his family contacted because he basically had no contact with his family since the age of fifteen (he was thirty-seven at the time of this crime). Grant testified during the penalty stage of the proceedings.

¶ 7 Grant testified that he had five brothers and three sisters and that he was somewhere in the middle according to birth order. He testified that he first left home when he was twelve, and then at seventeen he left home for good because he was sent to prison. He had been incarcerated since that time except for a short period when he was pa-roled at the age of nineteen. Between the ages of twelve and seventeen he spent time in several juvenile facilities because of bad behavior.

■ ¶ 8 During an evidentiary hearing ordered by this Court, family members testified that Grant was raised by his mother, as his father left before he was born. He was the sixth of nine children and was raised in poverty. Grant started getting into trouble by stealing. One of his sisters testified that he stole clothes and shoes for his younger siblings. Grant's family members would have asked the jury to spare his life.

¶ 9 Grant's childhood, unlike Wiggins' life, was a matter of choice. Grant chose to steal at an early age. He was not abused sexually or physically by those in authority over him. His continued choices to commit criminal acts resulted in his long-term incarceration. It was during this incarceration that he committed the murder of Gay L. Carter, a kitchen supervisor for the Oklahoma Department of Corrections.

¶ 10 Trial counsel concluded that having family members testify during the punishment stage would be counterproductive, because they had not had much contact with him due to his long term incarceration. He was concerned about the family testifying how much they cared for Appellant, when, in fact, they had rarely visited Appellant while he was in prison. The testimony at the evidentiary hearing revealed that Grant's mother visited him once a year for an hour each time. His father testified that he never visited Grant in prison. His brothers and sisters testified that they had visited him no more than five times. Grant's uncle, Clayton Black, testified that he had visited him at least once or twice each year, usually visiting with Grant's mother. One family member testified that they knew Grant was charged with murder, but they never took it upon themselves to determine the existence of or timing of a trial.

¶ 11 In our original opinion, we found that counsel's failure to contact family members did not fall "outside the wide range of professionally competent assistance." *Grant,* 2002 OK CR 36, ¶ 87, 58 P.3d at 800. Further-

more, we held that Grant could not show that the failure to present the testimony of family members rendered his sentence unreliable. *Grant*, 2002 OK CR 36, ¶ 88, 58 P.3d at 800. Grant could not show that he was prejudiced by counsel's conduct. *Id.* While counsel could have contacted family members through Grant's prison records, and did ask an investigator to attempt to contact the family, no contact was ever made.

¶ 12 The *Wiggins* case does not change our decision. Counsel's decision in this case was driven by Grant's own request to not have his family contacted. *See Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066; *Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir.2001). Counsel's concern that the family members' testimony showing care for Grant would be overshadowed by their actions of limited contact during the past twenty years of his life was a valid concern. Counsel's decision was directed by his client. His knowledge of Grant's early life, through conversations with Grant, would not have been enhanced by interviewing family members. The Court in *Wiggins* emphasized, "*Strickland* does not require counsel to investigate every conceivable line of mitigation evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at ——, 123 S.Ct. at 2541. Counsel in this case followed the directions of his client and made a reasonable decision that investigation into Grant's family history by contacting family members was unnecessary. *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066.

¶ 13 There are probably only few death penalty cases where counsel would not be ineffective for a failure to undertake an independent investigation of a defendant's early life by contacting family members. This is one of them. The factors that make counsel's independent investigation unnecessary was Grant's own desire to not have his family contacted and his twenty years of incarceration prior to this crime.

¶ 14 Even if counsel's failure to independently contact Grant's family fell below ac-ceptable standards of conduct, his conduct did not result in prejudice in this case. There is no indication that had the jury been confronted with the testimony of family members the result of this proceeding would have been different. The jury found the existence of three aggravating circumstances.[3] Grant was incarcerated for committing violent crimes. He violently and repeatedly stabbed a civilian kitchen worker while he was serving a sentence for a violent crime. The testimony of Grant's family members would not have swayed the jury from imposing the death penalty.

## CONCLUSION

¶ 15 We find that counsel's failure to undertake independent investigation into Grant's childhood, by contacting family members, was reasonable. Furthermore, we find that, had the family members been contacted and been allowed to testify at trial, the outcome of this case would not have been different. No relief is required in this case based on our application of *Wiggins* to this case.

JOHNSON, P.J.: concurs in results.

LUMPKIN, J.: specially concurs.

CHAPEL, J.: dissents.

STRUBHAR, J.: concurs.

LUMPKIN, J: Special Concur.

¶ 1 I concur in Judge Lile's opinion, but write separately to emphasize several distinguishing differences between the facts of this case and those presented in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In addition, I also believe it is important to refresh our memories that it is the client's case, not the lawyer's.

¶ 2 In the direct appeal of this case, we remanded for an evidentiary hearing on the issue of ineffective assistance of trial counsel on this very issue. As our subsequent opinion reflects, trial counsel consulted with the defendant and the defendant was an integral

---

**3.** "The defendant was previously convicted of a felony involving the use or threat of violence to the person;" "The murder was committed by a person while serving a sentence of imprisonment on conviction of a felony;" and "The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

part of the strategic decision making process regarding mitigation evidence. *See Grant v. State,* 2002 OK CR 36, ¶ 76–78, 58 P.3d 783, 799.

¶ 3 As reflected in our opinion, trial counsel testified there were two main reasons family members were not called to testify as mitigation witnesses:

First, Grant told him that he basically had no contact with his family since he left home at the age of fifteen and was incarcerated since the age of nineteen. Grant indicated that he did not know where his family was located other than somewhere in Oregon. Grant told him that he didn't want his family involved in the proceedings.

*Grant,* 2002 OK CR 36, ¶ 76, 58 P.3d at 799.

Secondly, Bowen testified that because the family members had no close contact with Grant in some twenty years, their testimony would be of little help. He felt like if they testified about their relationship, they would be vulnerable on cross-examination because they hadn't had any contact with him since he had been incarcerated.

*Grant,* 2002 OK CR 36, ¶ 77, 58 P.3d at 799. Nevertheless, trial counsel still had investigators try to contact family members, but they were unable to do so prior to trial.

¶ 4 Upon reviewing the testimony presented at that evidentiary hearing, we held, "Grant's wish to exclude his family from the proceedings controlled trial counsel's actions in this case". *Grant,* 2002 OK CR 36, ¶ 84, 58 P.3d at 800.

¶ 5 A very important factor not addressed in *Wiggins* (and overlooked by the dissent in this case) is that a competent client is in charge of his or her case, not the lawyer. *See* Rule 1.2, *Oklahoma Rules of Professional Conduct,* Title 22, Ch. 18, App. (2003). That factor was a crucial part of our analysis and holding in the direct appeal opinion.

¶ 6 When a lawyer is hired or appointed to represent a client in a criminal proceeding—even in a capital case—that lawyer does not "own" the case. The lawyer has a responsibility to advise, inform, and consult with the client. Meanwhile, the client has the right to be involved in the decision process that will affect his or her life. Indeed, as we made clear in *Wallace v. State,* 1997 OK CR 18, ¶¶ 6, 27, 935 P.2d 366, 370, 376, a defendant may even waive the right to present any mitigating evidence when fully informed as to that right and the effect of the waiver.

¶ 7 In *Nelson v. State,* 2001 OK CR 4, 21 P.3d 55, we were presented with a situation where the defendant initially pled not guilty by reason of insanity to a charge, but later decided to amend his plea. Counsel argued during sentencing for the judge to consider the mental problems in his sentencing decision. In addressing a challenge to counsel's effectiveness we held:

However, Appellant's counsel was ethically bound to accept his competent client's decision regarding the plea to be entered. This is clear from Rule 1.2(a) of the Rules of Professional Conduct. Indeed, the committee comments to Rule 1.2 note "[t]he client has ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law . . . ."

*Nelson,* 2001 OK CR 4, ¶ 29, 21 P.3d at 60; *see also, Alvord v. Wainwright,* 725 F.2d 1282, 1289 (11th Cir.1984), *cert. denied,* 469 U.S. 956, 105 S.Ct. 355, 83 L.Ed.2d 291 (1984)("In light of Alvord's refusal to assert the insanity defense, although earnestly counseled by his defense attorney to do so, we conclude that Meyers rendered competent assistance ... In addition, given Alvord's competency, Meyers was ethically bound to follow his client's wishes. *See, Foster v. Strickland,* 707 F.2d 1339, 1343 (11th Cir.1983).")

¶ 8 This analysis and holdings are fully consistent with the U.S. Supreme Court's seminal decision in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In *Faretta* the Court held, "The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense". 422 U.S. at 819, 95 S.Ct. 2525.

¶ 9 The record in this case reveals the defendant was personally involved in the decision making process of what witnesses to

call during the trial's punishment phase. That decision is supported by logical, credible reasons. Additionally, regardless of the defendant's directions, the trial attorney had his investigator continue to seek out family members up until the time of the sentencing phase of trial. This is not the same inactivity found in *Wiggins*. Rather, this record reveals a competent client directing counsel as he has the constitutional right to do under *Faretta.*

¶ 10 The *Wiggins* decision should not be misapplied or misconstrued in a way that dilutes the use of "trial strategy" when dealing with cases of this type at the appellate level. Granted, *Wiggins,* in analyzing *Strickland* and the issue of ineffective assistance relating to mitigation efforts, states that "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Wiggins,* 539 U.S. at ——, 123 S.Ct. at 2538. However, as previously stated, *Wiggins* does not factor in the input and direction of a competent client in the decision making process.

¶ 11 In *Roberts v. State,* 1996 OK CR 7, ¶ 29, 910 P.2d 1071, 1081, we addressed the situation that occurs when a defendant has been cooperative throughout the trial and the attorney has no reason to believe he has not received necessary information from his client:

> Concerning mitigating evidence, counsel cannot be ineffective for failing to more fully develop Petitioner's life history, as Petitioner has not shown he presented such information to his attorney. Courts have historically held a defendant bears some burden of supplying counsel with necessary information within his knowledge. *See United States v. King,* 936 F.2d 477, 480 (10th Cir.), *cert. denied,* 502 U.S. 1008, 112 S.Ct. 647, 116 L.Ed.2d 664 (1991). . . ."

*See also, Brown v. State,* 1997 OK CR 1, 933 P.2d 316, 321–322.

¶ 12 The punishment phase of a capital case is not merely a jump through the hoops, mark off the check list process. What may

be appropriate and helpful in one case can be harmful in another. It appears there is an attitude/perspective developing from those who are far removed from the dynamics of the courtroom that a certain number of experts and family members must be presented in every case in order for counsel to be effective. That is an unrealistic view that disregards the fact it is the defendant/client, not the attorney, who has the ultimate ability to make those choices, upon consultation with counsel. Moreover, this view has created a cottage industry for minimally relevant experts from every persuasion, some with very questionable credentials.

¶ 13 In this particular case, our remanded evidentiary hearing revealed that defendant left home at the age of fifteen and has been incarcerated from the time he was nineteen. During this time—more than twenty years— family members had minimal contact with him. Trial counsel related his concerns about putting family members on the stand to say how much they loved and cared for defendant when those same family members rarely, if ever, visited him in prison. Therefore, it was reasonable and logical for counsel to follow his client's directions to rely on the defendant's testimony as to his childhood, together with the psychologist's testimony.

¶ 14 To further put the facts into perspective, it must be remembered that the defendant was serving a total of one-hundred thirty (130) years for four separate armed robberies and had been in prison for about twenty years when he "savagely and repeatedly stabbed Gay Carter, a food service supervisor at the Connor Correction Center in Hominy, Oklahoma" on November 13, 1998. *Grant,* 2002 OK CR 36, ¶ 2, 58 P.3d at 789.

¶ 15 While defendant may have had a bad childhood, it had nothing to do with the death of Gay Carter. Periodic visits from family members would have had no impact on this jury's decision. Twenty years of structured incarceration has not been sufficient to ameliorate the defendant's violent tendencies and that is what impacts the average juror as they view the savagery of this attack on an unarmed female food service worker. The

defendant was competent and participated in the strategic decisions with counsel. Those decisions are supported by the record and distinguish the facts of this case from *Wiggins*.

¶ 16 I concur the judgment and sentence should be affirmed.

CHAPEL, Judge, Dissenting.

¶ 1 Some people just can't take a hint. On October 6, 2003, the Supreme Court of the United States responded to John Marion Grant's petition for a writ of certiorari, arising from this Court's rejection of his direct appeal from his capital conviction,[1] by granting the petition, summarily vacating the judgment of this Court, and remanding the case to this Court, "for further consideration in light of *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)."[2] In a capital case like Grant's—with further extensive review through the federal habeas corpus process inevitably following the direct appeal decision in this Court, and with a subsequent opportunity for the United States Supreme Court to intervene, through certiorari review of the decision of the United States Court of Appeals for the Tenth Circuit—intervention by the Supreme Court at this stage of the appellate process is rare and remarkable. One would think that this Court would issue a careful, thoughtful response. That has not happened.[3]

¶ 2 The Supreme Court has sent this Court a message, and its reference to the *Wiggins* decision would seem to make interpretation of this message a rather simple task. Yet today's Court majority chooses to ignore the message, through a pinched and shallow interpretation of *Wiggins* and a determination to maintain its earlier ruling. I believe that the Court's current actions will merely serve to delay, rather than to prevent, an eventual re-trial of the punishment stage of Grant's trial, thereby causing a pointless waste of monetary and human resources and an unnecessary extension of the stress and anxiety that accompanies all capital cases, for all of the persons affected by them.

¶ 3 I dissented from this Court's original decision in a published opinion.[4] Although I agreed with the Court that the first-degree murder conviction in Grant's case should be affirmed,[5] I concluded that Grant's death sentence should be overturned for two reasons: (1) his trial counsel failed to adequately investigate and present substantial mitigating evidence about his childhood and family history; and (2) the trial court erroneously refused to excuse a particular juror, resulting in the prejudicial denial of one of Grant's statutory peremptory challenges.[6]

¶ 4 The Supreme Court's reference to *Wiggins v. Smith* makes clear that it is the second-stage ineffective assistance of counsel claim that our Court is being instructed to reconsider.[7] In *Wiggins*, the Supreme Court found that Kevin Wiggins should be given federal habeas corpus relief, because "his attorneys' failure to investigate his background and present mitigating evidence of his unfortunate life history at his capital sentencing proceedings violated his Sixth

---

1. *See Grant v. Oklahoma*, 2002 OK CR 36, 58 P.3d 783.

2. *See Grant v. Oklahoma,* —— U.S. ——, 124 S.Ct. 162, 157 L.Ed.2d 12 (2003).

3. And for what it's worth, today's special concurrence does nothing to fill this void.

4. *See Grant v. State*, 2002 OK CR 36, 58 P.3d 783, 801–13 (2003) (Chapel, J., dissenting).

5. *Id.* at 801, 813. I noted that "there was never any doubt that it was Grant who killed [Gay] Carter," that Grant killed Carter by "repeatedly and brutally stabbing her to death," and that Grant's insanity defense "had no realistic chance for success at trial." *Id.* at 801.

6. I continue to maintain that both of these trial errors, considered both individually and cumulatively, necessitate a re-sentencing in Grant's case. *See id.* at 813.

7. *See Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Consequently, the juror removal/peremptory challenge claim, *see Grant*, 58 P.3d. at 809–13, is not discussed further herein. My analysis of Grant's second-stage ineffective assistance of counsel claim, on the other hand, formed the bulk of my original dissent, and is incorporated herein by reference. *See id.* at 801–09.

Amendment right to counsel."[8] The *Wiggins* Court concluded that this failure constituted ineffective assistance of counsel.[9] There can be no doubt that the legal issue before the Supreme Court in *Wiggins* is the same one now before this Court.[10]

¶ 5 Yet today's majority gives only partial, passing recognition to the legal principle that forms the foundation for the Supreme Court's ruling in *Wiggins* (and was likewise the basis of my earlier dissent). This principle for evaluating attorney performance was first articulated in *Strickland v. Washington*,[11] the Supreme Court's 1984 watershed decision that articulated the standards by which all ineffective assistance of counsel claims are evaluated. The *Strickland* Court recognized that when evaluating the performance of defense counsel:

[S]trategic choices made after thorough investigation of law and facts relevant to

8. *Wiggins*, 539 U.S. at ——, 123 S.Ct. at 2531.

9. *Id.* at ——, 123 S.Ct. at 2543–44.

10. It should be noted, however, that the habeas context of *Wiggins* actually made the Supreme Court's review more constrained than that of this Court. *Wiggins* came before the Court in the context of a habeas corpus action, after both the Maryland Court of Appeals and the United States Court of Appeals for the Fourth Circuit rejected Wiggins' ineffective assistance claim. Thus the Supreme Court could only grant habeas relief to Wiggins upon a finding that the rejection of his claim by the Maryland Court of Appeals was not only *wrong*, it was *unreasonable*. *See id.* at ——, 123 S.Ct. at 2534–35 (explaining habeas standards of 28 U.S.C. § 2254(d), as interpreted in *Williams v. Taylor*, 529 U.S. 362, 409–11, 120 S.Ct. 1495, 1521–22, 146 L.Ed.2d 389 (2000), to require finding that state court decision was "objectively unreasonable," in addition to being wrong).

11. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

12. *Id.* at 690–91, 104 S.Ct. at 2066. The Supreme Court quoted this portion of *Strickland* in *Wiggins*. *See Wiggins*, 539 U.S. at ——, ——, 123 S.Ct. at 2535, 2541; and I likewise quoted from this passage in my original dissent. *See Grant*, 58 P.3d at 803 n. 6.

13. *See* Court Opinion, p.179 (quoting first sentence from *Strickland* quotation *supra* ).

14. *Id.* Today's special concurrence does the same thing. *See* Special Concurrence (Lumpkin, J.), p.

plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.[12]

After recognizing this basic principle and quoting the first sentence of this passage from *Strickland*,[13] today's majority opinion simply goes on to say, "The facts and circumstances of Wiggins' case are diametrically opposed to the facts and circumstances of Grant's case."[14] Surely the Supreme Court

178 ("[I] write separately to emphasize several distinguishing differences between the facts of this case and those presented in *Wiggins* ...."). The special concurrence, however, has a particular ax to grind, *i.e.*, the seemingly obvious claim that "it is the client's case, not the lawyer's." *Id.* Although the special concurrence gives passing recognition to the lawyer's responsibility "to advise, inform, and consult with the client," *id.* at 179–80, the gist of the opinion is that an attorney should just follow his client's initially-stated preferences, without worrying much about advising the client about his rights, the risks of a particular approach, how trials (and particularly capital trials) are conducted, what is most likely in the client's best interests, *etc.* The case of *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), cited by the special concurrence, did indeed give Grant the right to represent himself. Grant wisely chose not to invoke this right, however, and instead relied upon his separate right to the *assistance* of counsel, which unfortunately, he did not adequately receive. The fact that Grant met the minimal legal standard of being a "competent client"—a description that appears repeatedly in the special concurrence—does not mean that he was equipped or adequately informed to make a reasonable and intelligent determination regarding the presentation of particular mitigating evidence in his case. The record does not support the claim that he actually made such a decision, nor would our own standards find that any such waiver by Grant could be upheld as being informed and intelligently made. *See Wallace v. State*, 1995 OK CR 19, 893 P.2d 504, 512–13, *cert. denied*, 516 U.S. 888, 116 S.Ct. 232, 133 L.Ed.2d 160 (1995).

hoped that this Court would do more than simply point out factual differences between these two cases.[15]

¶ 6 Within its attempt to distinguish Grant's case, today's Court majority makes a factual claim that appears to be the real basis of its decision, but which simply cannot be accepted at face value. The Court asserts, "Grant specifically told counsel that he did not want his family contacted because he basically had no contact with his family since the age of fifteen...."[16] The Court also writes that trial counsel's failure to contact members of Grant's family "was driven by Grant's own request not to have his family contacted."[17] Hence the majority apparently concludes, more vehemently than it did in its original opinion, that Grant waived the presentation of mitigating evidence from members of his family.[18]

¶ 7 On January 4, 2002, this Court remanded Grant's case to the district court for an evidentiary hearing on Grant's second-stage ineffective assistance of counsel claim.[19] Within our remand order we directed the district court to determine whether Grant waived his right to present mitigating evidence from his family, and if so, whether the waiver was knowing and intelligent. The evidentiary hearing was held on February 22, 2002, and the district court filed its findings of fact and conclusions of law regarding the remanded issue on April 3, 2002.

¶ 8 Grant's trial counsel testified at the evidentiary hearing that Grant "indicated ... that he really didn't want his family to be involved" and that family testimony "was not something that [Grant] was interested in pursuing."[20] On the other hand, trial counsel testified that he was aware that a defendant's waiver of his right to present mitigating evidence during the second stage of his capital trial is only valid if the defendant is adequately advised of and understands the nature of mitigating evidence and its role in the capital sentencing process.[21] Yet trial counsel acknowledged that he had no specific recollection of discussing with Grant (1) what the second stage of a capital trial was about,

15. And as my later analysis points out, the factual differences between the two cases can easily be interpreted to suggest that Grant is *more* deserving of capital sentencing relief than Wiggins, rather than less deserving, as today's majority concludes.

16. Court Opinion, p. 180.

17. *Id.* at 180–81. The Court later asserts that Grant's counsel's decision not to put on family testimony "was directed by his client" and states that "[c]ounsel in this case followed the directions of his client." *Id.* at 181.

18. Although the Court's original opinion referred to "Grant's wish to exclude his family from the proceedings," it did not explicitly conclude that Grant specifically told his counsel not to contact his family. *See Grant,* 58 P.3d at 800. Furthermore, the asserted rationale (from trial counsel) for not involving Grant's family (*i.e.,* the lack of contact with the family) was not actually attributed to Grant himself, *see id.,* as it is now. Today's special concurrence attempts to strengthen the claim that Grant "waived" the presentation of mitigating family evidence simply by restating the claim repeatedly, though without support from the record. The lack of evidentiary support for this claim is discussed *infra.*

19. In order to grant this evidentiary hearing, this Court was required to find and did find that Grant had shown "by clear and convincing evidence that there is a strong possibility his trial counsel was ineffective for failing to develop and present mitigating evidence from members of [his] family." *See* Rule 3.11(B)(3)(b)(i), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18 App. (2002) (articulating standard applied by this Court).

20. The Court majority's statement, quoted *supra,* about Grant specifically telling his counsel not to contact his family is not supported by any evidence in the record. It should likewise be noted that today's special concurrence similarly prefers to "summarize" and recast defense counsel's actual testimony, about Grant "indicat[ing] ... that he really didn't want his family to be involved," into a stronger, more *decisive* form than that actually given by counsel. *See, e.g.,* Special Concurrence, p. 179 ("[T]rial counsel consulted with the defendant and the defendant was an integral part of the strategic decision making process regarding mitigation evidence."); *id.* at 180–81 (referring to Grant's "directions" to his counsel, which defense counsel "followed," to rely on Grant's own testimony regarding his childhood). Nothing in the record supports the current claims that Grant was actually "directing" his counsel regarding the presentation of particular mitigating evidence.

21. *See Wallace,* 893 P.2d at 510–13. This Court noted in *Wallace,* "It is beyond question mitigating evidence is critical to the sentencer in a capital case." *Id.* at 510.

(2) the potential role and importance of family testimony in a capital trial, or (3) the fact that family members could be important sources of mitigating information, even if they did not testify.[22] Trial counsel likewise testified that he was familiar with the requirements for a waiver hearing, in the event that a defendant desired to waive the presentation of mitigating evidence, but that he never considered seeking such a hearing in Grant's case.[23]

¶ 9 After reviewing the totality of the evidence presented at the evidentiary hearing, the district court found that Grant did *not* waive the presentation of mitigating evidence from members of his family: "[I]t must be concluded that defendant [Grant] did not specifically waive the presentation of this testimony." This Court has repeatedly held that such factual findings are entitled to "strong deference," so long as they are supported by the record in the case.[24] And the record in Grant's case does indeed strongly support the trial court's "no waiver" finding of fact.[25]

Hence the majority cannot rely on its own waiver finding to justify its conclusion that counsel's failure to seek out and develop mitigating evidence from Grant's family was reasonable.[26]

¶ 10 The majority also attempts to show that Grant's claim of ineffective assistance is less persuasive than that of Wiggins based upon the following assertions: (1) Wiggins had no prior criminal history, while Grant was incarcerated for prior robberies at the time he killed Gay Carter; (2) no evidence about Wiggins' life history and family background was presented at his capital sentencing, while Grant's counsel "allowed Grant to testify about his early childhood"[27]; and (3) Wiggins was horribly victimized as a child, through severe deprivation and physical and sexual abuse, while Grant was basically just a poor kid who chose a life of crime.[28]

¶ 11 It is true that Wiggins had no prior convictions at the time he killed seventy-seven year-old Florence Lacs.[29] It is also

**22.** Hence the record in this case could not possibly support a finding that any waiver by Grant was "knowing and intelligent." *See id.* at 512. The trial court did not even reach this secondary issue, since it concluded that no waiver occurred in Grant's case.

**23.** *See id.* at 512–13 (establishing district court procedure for determining whether capital defendant who desires to waive presentation of mitigating evidence is competent and is making a knowing and intelligent waiver decision). This procedure was not followed in Grant's case, and the record contains no evidence of any statements to the trial court regarding Grant's desire to waive the presentation of mitigating evidence.

**24.** *See* Rule 3.11(B)(3)(b)(iv), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18 App. (2002); *see also Glossip v. State*, 2001 OK CR 21, 29 P.3d 597, 602 ("This Court will give the trial court's findings strong deference if supported by the record, but we shall determine the ultimate issue of whether trial counsel was ineffective.") (citing Rule 3.11(B)(3)(b)(iv)); *see also Wood v. State*, 1998 OK CR 19, 959 P.2d 1, 17; *Humphreys v. State*, 1997 OK CR 59, 947 P.2d 565, 577, *cert. denied*, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998).

**25.** In addition to the facts noted above, the following evidentiary hearing evidence also supports the trial court's finding that no waiver occurred: (1) trial counsel and his investigators acknowledged having conversations with Grant about his family members and where they could be found; (2) counsel and the investigators indi-

cated that Grant provided the family contact information that he had; and (3) during the trial Grant gave his counsel a letter from his mother, bearing a local return address. Nevertheless, the record is clear that not a single member of Grant's family was ever contacted regarding his trial.

**26.** Despite the Court's apparent reliance on its own finding of waiver, the Court never actually finds (in today's opinion or its prior opinion) that the trial court's contrary finding is either erroneous or not supported by the record. Today's special concurrence likewise implicitly finds that Grant "waived" the presentation of evidence about his childhood and family history—by "directing" his counsel not to pursue or present such evidence—yet never grapples with or even mentions the trial court's specific finding to the contrary.

**27.** *See* Court Opinion, p. 180.

**28.** *See id.* at 180.

**29.** The Maryland Court of Appeals wrote the following regarding the discovery of Wiggins' victim, who was found dead in her own bathtub:

She was lying on her side, half covered by cloudy water. It appeared that a household cleaner and a bug spray had been poured or sprayed on her. She was wearing a white blouse and a blue skirt, but had on no underwear. The skirt had been raised to her waist. The apartment had been ransacked.

true that Grant was already serving a total of 130 years in armed-robbery prison sentences at the time he killed Gay Carter, and that this factor makes the prejudice prong of the ineffective assistance test more difficult for Grant to meet (compared to Wiggins). However, it likewise makes the performance prong of the ineffective assistance test easier for Grant to meet (relative to Wiggins), since the aggravating factors of Grant's criminal history and current incarceration made the need for significant mitigating evidence in his case more critical. Hence these considerations should have spurred Grant's counsel to pursue any such evidence even more diligently.

¶ 12 As I noted in my original dissent, when faced with a client who is obviously guilty of first-degree murder, and who committed this crime while already serving prison sentences for prior violent offenses, the essential task of defense counsel should have been obvious: "give the jury a reason to spare his life." [30] The strategic options open to Grant's counsel were extremely limited. He could not realistically contest Grant's guilt, nor did Grant's recent life history (of incarceration) offer much in the way of mitigating evidence. Hence defense counsel's "choice" to not fully pursue the strategy of at least discovering what Grant's childhood and early life were like simply cannot be cloaked in the mantra of a "reasonable strategic decision."

¶ 13 The record suggests that rather than *deciding* not to pursue mitigating evidence about Grant's early life from members of his family, Grant's counsel recognized that such information was relevant and potentially helpful, he just never accomplished the task of actually obtaining it.[31] As the *Wiggins* Court noted in regard to defense counsel in that case, the claim that Grant's counsel made a strategic decision not to diligently pursue mitigating family evidence "resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of [his] deliberations prior to sentencing." [32]

*Wiggins v. State*, 352 Md. 580, 724 A.2d 1, 4 (1999). The medical examiner determined that the cause of death was drowning. *Id.* Wiggins, who had been working as a painter in the victim's apartment building, was seen talking to Lacs on the evening she disappeared. A few hours later, Wiggins was driving Lacs' car to the home of his girlfriend, and together they went shopping over the next two days using Lacs' credit cards. They later pawned one of her rings and were eventually arrested, still driving Lacs' car. *Id.* at 4–5.

30. *Grant*, 58 P.3d at 802.

31. It should be noted in this regard that the trial court found that all nine of Grant's family members who testified at the evidentiary hearing "were findable and would have testified at trial if they had been asked." And today's Court majority acknowledges that "[w]hile counsel could have contacted family members through Grant's prison records, ... no contact was ever made." *See* Court Opinion, p. 180–81.

32. *Wiggins*, 539 U.S. at ——, 123 S.Ct. at 2538. The fact that trial counsel gave a reason for his purported "decision" not to put on evidence from members of Grant's family—namely, that the family had not been in substantial contact with Grant for a long time, making any claims about how much family members cared for him seem specious—does not mean that this Court must accept this testimony unquestioningly *or*, even if the reason asserted is sincere, that it should be considered "reasonable." The *Wiggins* Court did not fully accept the accuracy of defense counsel's after-the-fact testimony in that case, about the extent of his knowledge of Wiggins' life history at the time of trial. *See id.* ——, 123 S.Ct. at 2541 (speculating that rather than actually "lying," defense counsel could be suffering from "a mistaken memory shaped by the passage of time"). Similarly, the testimony of Grant's counsel about his "decision" not to put on any family testimony seems inconsistent with his separate testimony about the halfhearted and faltering attempts he did make (through investigators) to locate and interview members of Grant's family. And the claim in today's special concurrence that trial counsel "had his investigator continue to seek out family members up until the time of the sentencing phase of trial"—as if both trial counsel and the investigator diligently sought out family members, but were simply confounded by the enormity of the task, *see* Special Concurrence, p. 180—is not supported by the record in this case. In fact, the trial court specifically found that all of the family members were "findable," through Grant's prison records.

Furthermore, even actual strategic decisions by counsel are always subject to evaluation for their "reasonableness"; and given the circumstances of Grant's case, a decision not to diligently pursue family and life history evidence in his case simply could not be evaluated as "reasonable." *See Grant*, 58 P.3d at 802–06 (my original dissent). The fact that members of Grant's family might have had a hard time claiming that they had remained "close" to Grant through the years, does not change the fact that these individ-

¶ 14 As the *Wiggins* Court acknowledged, defense counsel in that case did pursue two other strategies during Wiggins' capital sentencing: (1) attempting to convince the jury that Wiggins was not responsible for the murder; and (2) noting Wiggins' lack of prior convictions.[33] Nevertheless, the Supreme Court concluded that these strategies did not exclude a further strategy of presenting mitigating evidence about Wiggins' tragic childhood, and more importantly, that these alternative strategies certainly could not explain defense counsel's failure to fully *investigate* and discover this mitigating evidence.[34] Since Grant's counsel did not even have any similar alternative strategies available to him, his failure to diligently pursue the family evidence is even less justifiable. And as the Supreme Court emphasized in *Wiggins,* counsel's failure to first adequately investigate and uncover this evidence made his "decision" not to present this (undiscovered) evidence during Grant's trial even less deserving of deference as a "reasonable strategic decision." [35]

¶ 15 The second ground upon which today's Court majority attempts to distinguish the current case from *Wiggins* is the factual claim that Grant actually did "testify about his early childhood," while no such testimony was presented in Wiggins' case.[36] Today's majority continues to insist that all of the information that came out at the evidentiary hearing about the bleak circumstances of Grant's childhood is pretty much equivalent to Grant's trial testimony that he had five brothers and three sisters, and he was "somewhere in between." [37] This is quite a stretch. Furthermore, it is hard to understand how the Court majority could categorize Grant's trial testimony about how he left home and began getting into serious trouble as an adolescent as information about his "early childhood," [38] or how this negative information could possibly have served as an adequate substitute for the very sympathetic facts about Grant's earliest years of life. As far as actual presentation of mitigating evidence about the defendant's childhood, the cases of Grant and Wiggins are equivalent: no such evidence was present to the juries in either case.

¶ 16 Finally, I take up the Court's third proffered reason for distinguishing Grant's case from that of Wiggins, which amounts to a claim that Wiggins is just more deserving of relief than Grant, because Wiggins had a worse childhood and Grant is a worse person. In attempting to make this argument, today's majority makes a factual claim that is radio-talk-showesque, especially from the perspective of anyone familiar with the horrifying realities of childhood abuse, neglect, and exploitation of any kind. The claim: it is the child's fault. The majority writes, "Grant's childhood, unlike Wiggins' life[,] was a matter of choice." [39] Wow.

uals possessed powerful, critical evidence about the difficulties and deprivation of Grant's early years. Today's special concurrence belittles the impact of family members pledging love and pleading for mercy, *see* Special Concurrence, pp. 180–81, while totally ignoring their crucial role as fact witnesses to Grant's childhood—a kind of tunnel vision similar to that of defense counsel.

**33.** *Wiggins,* 539 U.S. at ——, 123 S.Ct. at 2533.

**34.** *Id.* at ——, 123 S.Ct. at 2541–43.

**35.** *Id.* at ——, 123 S.Ct. at 2541 ("We base our conclusion on the much more limited principle that 'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.' ") (quoting *Strickland* ). I conclude in the current case, as the *Wiggins* majority did in that case, that Grant's counsel's "incomplete investigation was the result of inattention, not reasoned strategic judgment," *id.* at ——, 123 S.Ct. at 2542, and that counsel was "not in a position to make a reasonable strategic choice" about the presentation of family testimony in Grant's case. *Id.* at ——, 123 S.Ct. at 2543.

**36.** *See* Court Opinion, p. 180.

**37.** In its original opinion, the Court concluded that all of this family testimony "would have repeated Grant's own account of his childhood." *Grant,* 58 P.3d at 800. The Court's willingness to equate Grant's testimony about the number of children in his family with detailed evidence about the circumstances of his childhood is also evidenced in the Court's current assertion that defense counsel's "knowledge of Grant's early life ... would not have been enhanced by interviewing family members." *See* Court Opinion, p. 181.

**38.** *See* Court Opinion, p. 180.

¶17 Grant *chose* to be abandoned by his father just after he was born; to be the sixth of nine children born to a mother who did not have the means or the wherewithal to care for her huge family; to never have a father figure living in his home; to be raised largely by his older sisters; to be "dirt poor," without indoor plumbing or a family car; to live in run-down, dangerous, and crime-ridden neighborhoods; to be bused to schools far from his home; *etc.* The majority apparently concludes that because the record does not suggest that Grant was "abused sexually or physically by those in authority over him" (as Wiggins was), and because Grant "chose to steal at an early age," his entire depressing childhood was his own "choice," and really not particularly mitigating at all.[40]

¶18 The majority also apparently sees nothing mitigating in the testimony of Grant's sister that his early thefts involved getting clothing and shoes for his younger siblings. It strikes me that Grant has run across a remarkably unsympathetic Court, but I am not so sure that a jury would be so unwilling to see Grant's sad childhood for what it was and to see the mitigating impact of this personal history.[41] The question is not whether Grant's background, family history, and some of his positive traits could excuse his cruel murder of Gay Carter. They certainly could not. The question is whether there is a "reasonable probability" that at least one juror—and it would only take one—could be sufficiently moved by the circumstances of Grant's life to choose to spare that life from execution.[42] I continue to believe that there is enough of a chance that this could happen that we should leave it to an *actual jury*, provided with the array of mitigating evidence that Grant's original jury never heard, to make this call. This Court

should not be making this life and death determination.

¶19 I continue to dissent from this Court's unwillingness to provide Grant with a new capital sentencing, before a jury that is fully informed about the circumstances of the life whose fate they must determine.

**39.** *Id.* at 180.

**40.** *See id.* at 180.

**41.** The cynicism of this Court regarding Grant's case is also revealed in the following statement: "There are probably only [sic] few death penalty cases where counsel would not be ineffective for a failure to undertake an independent investigation of a defendant's early life by contacting

family members. This is one of them." *Id.* at 181. How convenient.

**42.** *See Wiggins,* 539 U.S. at ——, 123 S.Ct. at 2543 ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance.").