BRISCOE, Chief Judge,
concurring in part and dissenting in part.
I agree with the majority that there is no merit to the two guilt-phase issues raised by Grant, i.e., the lesser-included instruction issue that is discussed in Section I of the majority opinion and the Confrontation Clause issue that is discussed in Section II of the majority opinion. As regards the lesser-included instruction issue discussed in Section I of the majority opinion, I rely on the OCCA’s findings and conclusions that no lesser-included instructions were required under Shrum v. State, 991 P.2d 1032, 1036 (Okla.Crim.App.1999) because the evidence adduced at trial could not rationally support a verdict for either first degree manslaughter or second degree murder. I would not rely on this court’s decision in Hooks v. Ward, 184 F.3d 1206, 1234 (10th Cir.1999) for the proposition that a state prisoner seeking federal habeas relief may not prevail on a Beck claim if a lesser-included instruction was not requested at trial. To be sure, the lead opinion in Hooks states “that a state prisoner seeking federal habeas relief may not prevail on a Beck claim as to a lesser included instruction that he or she failed to request at trial.” Id. But that statement was not joined by the remaining two panel members and therefore is not binding on the panel in this case.[1] And while the majority cites to several post -Hooks cases for the same proposition, Maj. Op. at 1012, all of those cases cite back, erroneously, to the lead opinion in Hooks. We need not repeat that error here.
I must respectfully part ways with the majority when it comes to Grant’s claim that his trial counsel was ineffective for failing to investigate and present available mitigating evidence during the sentencing phase of his trial. As I will outline below, the Oklahoma Court of Criminal Appeals (OCCA) erred in analyzing both prongs of the two-prong test for ineffective assistance outlined in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The OCCA was plainly wrong regarding several of the facts it relied on in assessing the performance of Grant’s counsel. And its misunderstanding of the mitigating evidence that was *1028 actually available for use by Grant’s defense counsel in turn colored its decision regarding the question of prejudice. Reviewing both of those prongs de novo, as we are obligated to do given the OCCA’s errors, it is my view that Grant has established that he was deprived of the effective assistance of counsel and is thus entitled to federal habeas relief in the form of a new sentencing proceeding.
Finally, because I would remand for a new sentencing hearing, it is unnecessary for me to express any views regarding the impact of the trial court’s erroneous admission of two “victim impact” statements.
I
Before addressing the merits of Grant’s ineffective assistance claim, it is useful to first review (a) precisely what occurred during the sentencing phase of Grant’s trial, and (b) the procedural history of Grant’s ineffective assistance claim on direct appeal.

A. The sentencing phase of Grant’s trial

During the sentencing phase of Grant’s trial, the prosecution presented evidence to support three aggravating circumstances that it had alleged in its bill of particulars: (1) that Grant was previously convicted of three felony offenses involving the use or threat of violence to the person (specifically three prior robbery with firearms convictions, all occurring when he was nineteen years old), (2) that the murder of Gay Carter was committed by Grant while he was serving a sentence of imprisonment with the Oklahoma Department of Corrections (ODOC) on conviction of a felony, and (3) the existence of a probability that Grant would commit future criminal acts of violence that would constitute a continuing threat to society. To begin with, the prosecution expressly incorporated all of the guilt-phase evidence. In turn, the prosecution presented testimony from an ODOC employee who, based on Grant’s official ODOC records, confirmed the existence of Grant’s prior criminal judgments and sentences. Lastly, the prosecution presented victim impact testimony from June Prater and Larry Young. Prater, the sister of victim Gay Carter, read into the record a written victim impact statement prepared by the victim’s daughter, Pam Carter. Young, a longtime friend of the victim and her family, read into the record a written victim impact statement prepared by the victim’s brother, Roy Westbrook.
Grant’s lead trial counsel, James Bowen, argued in his opening statement that “Grant suffered] from a severe mental illness which eloud[ed] his reasoning and his ability to control himself and his ability to be in touch with reality,” Trial Tr., Vol VI, at 1563, and thus “should not be given the death penalty,” id. at 1564. The defense team, comprised of Bowen and attorney Amy McTeer, then proceeded to incorporate by reference all of Grant’s guilt-phase evidence, and in addition presented the testimony of two witnesses: Grant and Daryl Shriner, a prison psychiatrist. None of Grant’s family members were present or testified on Grant’s behalf; indeed, none of them were aware of Grant’s trial because they were not contacted by Grant’s counsel. Grant testified in summary fashion regarding his childhood, noting that he had five brothers and three sisters and was “somewhere in between in terms of age.” Id. at 1565. Grant also noted that he got in trouble with the law as a juvenile and had to go to three different juvenile facilities. Id. at 1566. Grant testified that, in 1980 shortly after he became an adult, he committed three robberies within days of each other, was charged and pled guilty to those robberies, and was sentenced to a total sentence of 130 years. *1029 Id. at 1566-67. Grant apologized to Carter’s family, and then testified, as he did during the guilt phase of trial, that he did not have any memory of the murder and did not know why he committed it. Id. at 1568-69. On cross-examination, the prosecution explored in somewhat greater detail Grant’s juvenile and adult criminal history. Grant testified that he was twelve years old the first time he was sent to a juvenile facility, but he testified he did not have a recollection of his juvenile crimes. Id. at 1570-71. Grant testified that he was first committed to the custody of the ODOC in 1979 for accessory to burglary and accessory to robbery, and was paroled from ODOC custody in 1980. Id. at 1571. Grant testified that he had been on parole for approximately three months when he committed the three armed robberies that later resulted in his 180-year sentence. Id. at 1572. Grant admitted that he had been in trouble since he had been in the custody of the ODOC, including being in “[ujnauthorized areas and stuff, small stuff,” id., and had also been involved in fights in prison, including one altercation with a correctional officer shortly after he was imprisoned in 1980, id. at 1573. Lastly, Grant testified that he had no-recollection where the murder weapon came from. Id. '
Shriner, a psychiatrist employed at the facility where the murder occurred, testified that he had never talked to Grant, id. at 1582, but instead had reviewed ODOC’s mental health files pertaining to Grant. Id. at 1580. Shriner testified that one of the records in the file recommended that Grant be given certain anti-psychotic drugs, but that there was no indication in any of the other records that Grant had actually been prescribed such medication. Id. at 1583, 1586. Shriner testified that, because he had never evaluated Grant, he did not have a personal opinion regarding whether such drugs would be beneficial to Grant. Id. Shriner also testified that a prison psychiatrist who had seen Grant recommended that Grant take medication for anxiety, but that Grant had refused it. Id. at 1590.
During sentencing-phase closing arguments, the attorneys sparred primarily over the existence of the third alleged aggravating' circumstance, i.e., the existence of a probability that Grant represented a continuing threat. The prosecution argued that “[w]ith [Grant’s] history from the time he was 15 years old his conduct shows anyone who looks at it that he is capable in the future and quite probably may commit additional violent crimes against people.” Id. at 1608. McTeer argued in response that “there exist[ed] at least a question as to ... Grant’s mental stability,” and that “[a]n evaluation and/or treatment and medication could in fact render him less dangerous to society.” Id. at 1609.
After deliberating, the jury found the existence of all three alleged aggravating factors, including the continuing threat aggravator. The jury in turn fixed Grant’s punishment at death for the murder.

B. Grant’s direct appeal

The procedural history of Grant’s ineffective assistance claim is very unusual in certain key respects and thus worth mentioning. Grant, who was appointed new counsel to represent him on direct appeal, alleged in his direct appeal that his defense attorneys were ineffective for failing to investigate and present mitigating evidence from his family members. The OCCA granted Grant’s motion for an evidentiary hearing on the claim and remanded the matter to the state trial court. The state trial court conducted an evidentiary hearing, during which Grant’s attorneys presented testimony from ten witnesses: *1030 attorney Bowen and nine members of Grant’s family, including his mother, father, siblings, and a maternal uncle. The hearing was continued to a later date so that the parties could present testimony from three Oklahoma Indigent Defense System (OIDS) investigators that worked on the case: two that worked with Grant’s trial counsel prior to trial, and one that worked with Grant’s appellate attorneys on the direct appeal. The trial court subsequently allowed the parties to submit that testimony by stipulation. The trial court then issued written findings of fact and conclusions of law responding to specific points outlined by the OCCA in its remand order. Although the trial court found that Grant did not waive the presentation of mitigating evidence from his family members, and that Grant’s trial counsel, James Bowen, did little to develop the mitigating evidence, it concluded that Grant was not prejudiced by Bowen’s failure to present mitigating testimony from Grant’s family members.
On November 18, 2002, the OCCA issued a published opinion affirming Grant’s conviction and death sentence. Grant v. State, 58 P.3d 783, 801 (Okla.Crim.App.2002) (Grant I). The OCCA’s decision was not unanimous, however. Judge Chapel filed a dissenting opinion concluding, in pertinent part, “that the failure of defense counsel to investigate and present mitigating evidence from members of Grant’s family constituted constitutionally ineffective assistance of counsel and that Grant was prejudiced by this failure.” Id. at 808-09. Ip turn, Judge Chapel concluded that the “case should be remanded for a resentencing proceeding on this basis.” Id. at 809.
Following the OCCA’s denial of his direct appeal, Grant filed a petition for writ of certiorari with the United States Supreme Court. On October 6, 2003, the Supreme Court granted certiorari, vacated the OCCA’s judgment, and remanded the case to the OCCA “for further consideration in light of [its then recent decision in] Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).” Grant v. Oklahoma, 540 U.S. 801, 124 S.Ct. 162, 157 L.Ed.2d 12 (2003).
In Wiggins, the Supreme Court granted federal habeas relief to a Maryland state capital defendant on the grounds “that his attorneys’ performance at sentencing,” specifically the attorneys’ failure to investigate potential mitigating evidence, “violated his Sixth Amendment right to effective assistance of counsel.” 539 U.S. at 519-20, 123 S.Ct. 2527. In doing so, the Court emphasized that “[a] decision not to investigate ... ‘must be directly assessed for reasonableness in all the circumstances,’ ” id. at 533, 123 S.Ct. 2527 (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052), and “that ‘strategic choices made after less than complete investigation are reasonable’ only to the extent that ‘reasonable professional judgments support the limitations on investigation,’ ” id. (quoting Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052).
On remand from the Supreme Court, the OCCA reaffirmed its prior decision and rejected Grant’s claim of ineffective assistance of counsel. Grant v. State, 95 P.3d 178, 181 (Okla.Crim.App.2004) (Grant II). Judge Chapel again filed a dissent, the opening two paragraphs of which stated as follows:
Some people just can’t take a hint. On October 6, 2003, the Supreme Court of the United States responded to John Marion Grant’s petition for a writ of certiorari, arising from this Court’s rejection of his direct appeal from his capital conviction, by granting the petition, summarily vacating the judgment of this Court, and remanding the case to this Court, “for further consideration in light *1031 of Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).” In a capital case like Grant’s — with further extensive review through the federal habeas corpus process inevitably following the direct appeal decision in this Court, and with a subsequent opportunity for the United States Supreme Court to intervene, through certiorari review of the decision of the United States Court of Appeals for the Tenth Circuit — intervention by the Supreme Court at this stage of the appellate process is rare and remarkable. One would think that this Court - would issue a careful, thoughtful response. That has not happened.
The Supreme Court has. sent this Court a message, and its reference to the Wiggins decision would seem to make interpretation of this message a rather simple task. Yet today’s Court majority chooses to ignore the message, through a pinched and shallow interpretation of Wiggins and a determination to maintain its earlier ruling. I believe that the Court’s current actions will merely serve to delay, rather than to prevent, an eventual re-trial of the punishment stage of Grant’s trial, thereby causing a pointless waste of monetary and human resources and an unnecessary extension of the stress and anxiety that accompanies all capital cases, for all of the persons affected by them.
Id. at 184 (internal paragraph numbers and footnotes omitted). As in his dissent from the OCCA’s original opinion, Judge Chapel concluded that the proper remedy was “to provide Grant with a new capital sentencing, before a jury that is fully informed about the circumstances of the life whose fate they must determine.” Id. at 190.
II
Turning now to the merits of Grant’s ineffective assistance claim, I believe, for the reasons I shall outline below, that the OCCA erred in its analysis of both prongs of the Strickland test. In turn, reviewing both of these prongs de novo, I conclude that Grant’s claim has merit and entitles him to federal habeas relief in the form of a new sentencing proceeding.[2]

A. The deficient performance prong of the Strickland test

The majority spends virtually no time discussing the deficient performance prong of the Strickland test, and instead summarily concludes, based upon the State’s failure to dispute the district court’s analysis on this point, .that Grant’s trial attorneys performed deficiently in failing to contact and interview the members of Grant’s family to determine what mitigating evidence they could provide at the sentencing phase of Grant’s trial. Although I fully agree that Grant’s trial attorneys performed deficiently, I believe it is necessary to review the OCCA’s analysis on this point because that analysis informed (or, more appropriately, misinformed) the OCCA’s subsequent analysis of the prejudice prong of the Strickland test.
*1032 When it first decided Grant’s direct appeal, the OCCA offered the following explanation in support of its conclusion that Grant’s lead trial counsel, Bowen, did not perform deficiently:
During the evidentiary hearing, [lead] trial counsel [Bowen] was asked why he did not call family members as mitigation witnesses. He testified that there were two main reasons. First, Grant told him that he basically had no contact with his family since he left home at the age of fifteen and was incarcerated since the age of nineteen. Grant indicated that he did not know where his family was located other than somewhere in Oregon. Grant told him that he didn’t want his family involved in the proceedings. Regardless, Bowen did ask his investigators to try and contact Grant’s family. One investigator testified that he was unable to locate Grant’s family before trial. Appellant, John Grant, did not testify at this hearing.
Secondly, Bowen testified that because the family members had no close contact with Grant in some twenty years, their testimony would be of little help. He felt like if they testified about their relationship, they would be vulnerable on cross-examination because they hadn’t had any contact with him since he had been incarcerated.
The trial court found, and we concur, that the family members could have been contacted with the use of information located in Grant’s prison records and they would have been willing to testify at trial. The trial court also found that the witnesses’ testimony would have been cumulative to each other and would not have had a positive impact on the jury. We agree.
We find that counsel’s performance was not deficient. The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; Romano v. Gibson, 239 F.3d 1156, 1181 (10th Cir.2001), cert. denied, 534 U.S. 1046, 122 S.Ct. 628, 151 L.Ed.2d 548 (2001).... Grant’s wish to exclude his family from the proceedings controlled trial counsel’s actions in this case.
Trial counsel did present some mitigating evidence including Grant’s own testimony and a prison psychiatrist. The prison psychiatrist testified that Grant had never been treated for any mental illness or syndromes.
Grant testified about his childhood, that he had eight brothers and sisters and that he left home, for the first time, at the age of twelve. He testified that he had been in and out of institutions since his teen years. He testified that when he reached the age of seventeen he was sentenced to adult prison and served one year. He testified that once he got out he committed the robberies for which he was incarcerated when this crime took place. He apologized to the family of the victim. The mitigating evidence Grant now claims his attorney was ineffective for not presenting would have repeated Grant’s own account of his childhood.
Considering all of the evidence presented at trial and at the evidentiary hearing, we do not believe that trial counsel’s conduct was “outside the wide range of professionally competent assistance.” Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. The presentation of this evidence would have reinforced Grant’s status as a repeat offender who has spent the majority of his life in prison. He has had no meaningful contact with the family members who would have testified. They knew nothing about his conduct in prison. Even though they *1033 testified that they would have asked the jury to spare his life, this would have been expected by the jury and would not have made a difference in the sentence given.
Grant has made no showing that the failure to find his family members, and present their testimony at trial was the result of deficient performance, or that the failure rendered his sentence unreliable. See Burger v. Kemp, 483 U.S. 776, 795-96, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987). Even if he had shown deficient performance, Grant could not show that he was prejudiced by the failure to present this evidence.
Grant I, 58 P.3d at 799-800 (internal paragraph numbers omitted).
After the Supreme Court granted Grant’s petition for writ of certiorari and remanded the case to the OCCA with directions to reconsider Grant’s ineffective assistance claim in light of Wiggins, the OCCA reaffirmed its conclusion that Bowen did not perform deficiently:
In our original opinion, we found that counsel’s failure to contact family members did not fall “outside the wide range of professionally competent assistance.” Grant, 2002 OK CR 36, ¶ 87, 58 P.3d at 800. Furthermore, we held that Grant could not show that the failure to present the testimony of family members rendered his sentence unreliable. Grant, 2002 OK CR 36, ¶ 88, 58 P.3d at 800. Grant could not show that he was prejudiced by counsel’s conduct. Id. While counsel could have contacted family members through Grant’s prison records, and did ask an investigator to attempt to contact the family, no contact was ever made.
The Wiggins case does not change our decision. Counsel’s decision in this case was driven by Grant’s own request to not have his family contacted. See
Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; Romano v. Gibson, 239 F.3d 1156, 1181 (10th Cir.2001). Counsel’s concern that the family members’ testimony showing care for Grant would be overshadowed by their actions of limited contact during the past twenty years of his life was a valid concern. Counsel’s decision was directed by his client. His knowledge of Grant’s early life, through conversations with Grant, would not have been enhanced by interviewing family members. The Court in Wiggins emphasized, “Strickland does not require counsel to investigate every conceivable line of mitigation evidence no matter how unlikely the effort would be to assist the defendant at sentencing.” Wiggins, 539 U.S. at [533], 123 S.Ct. at 2541. Counsel in this case followed the directions of his client and made a reasonable decision that investigation into Grant’s family history by contacting family members was unnecessary. Strickland, 466 U.S. at 691, 104 S.Ct. at 2066.
There are probably only few death penalty cases where counsel would not be ineffective for a failure to undertake an independent investigation of a defendant’s early life by contacting family members. This is one of them. The factors that make counsel’s independent investigation unnecessary was Grant’s own desire to not have his family contacted and his twenty years of incarceration prior to this crime.
Grant II, 95 P.3d at 180-181 (internal paragraph numbers omitted).
The OCCA’s analysis of the deficient performance prong thus rests on a number of factual findings. To begin with, the OCCA concurred with the state trial court’s finding “that [Grant’s] family members could have been contacted with the use of information located in Grant’s pris *1034 on records and they would have been willing to testify at trial.” Grant I, 58 P.3d at 799; see Grant II, 95 P.3d at 181 (“While counsel could have contacted family members through Grant’s prison records, and did ask an investigator to attempt to contact the family, no contact was ever made.”). But the OCCA also found that “Grant’s childhood ... was a matter of choice,” Grant II, 95 P.3d at 180, and that Grant, as an adult, “ha[d] had no meaningful contact with the family members who would have testified,” Grant I, 58 P.3d at 800. The OCCA further found that the testimony of Grant’s family members “would have repeated Grant’s own account of his childhood,” id., and “would have been cumulative to each other,” id. at 799. Relatedly, the OCCA found that trial counsel’s “knowledge of Grant’s early life, through conversations with Grant, would not have been enhanced by interviewing [Grant’s] family members.” Grant II, 95 P.3d at 181. Lastly, the OCCA found that “Grant specifically told counsel that he did not want his family contacted,” id. at 180, and that trial counsel “followed the directions of his client.” Id. at 181.
As I shall outline below, all but the first of these factual findings are clearly contrary to, and rebutted by, the record developed during the trial court’s evidentiary hearing.[3]

1) The OCCA’s first factual error

To begin with, the OCCA’s characterization of Grant’s childhood as a “matter of choice” is clearly erroneous and indeed offensive when viewed in light of Grant’s life history, and is also contrary to well-established Supreme Court precedent. According to the testimony of Ruth Grant, Grant’s biological mother, Grant was one of nine children, four of whom, including Grant, were fathered by a man named Walter Grant. Shortly after Grant’s birth, Ruth testified, Walter Grant left Oklahoma with the two oldest children (Kenneth Grant and Ronnie Grant) and moved to Los Angeles. Ruth was left to raise her remaining children by herself with only part-time work and public assistance as their means of support. When Grant was approximately five years old, Ruth moved herself and her remaining children from Ada,' Oklahoma, to Oklahoma City in search of a better job and better living conditions. But as all of Grant’s family members agreed, Ruth’s quest for better living conditions for her family was not successful. After living for a short time near her brother, Clayton Black, Ruth and her children moved into an apartment in a housing project located in a crime-ridden neighborhood of Oklahoma City. Because of Ruth’s work schedule, and because his father had left the family years earlier, *1035 Grant and his siblings lacked adult supervision during most of their waking hours. Although it was undisputed that Grant thereafter began associating with a group of juvenile delinquents and in turn got into trouble for stealing, his younger sister Andrea Jean Grant explained that Grant’s purpose in stealing was to obtain clothes and shoes for his younger siblings to wear. Hr’g Tr. at 81. And Grant’s juvenile, offenses resulted in his spending a significant amount of time in several state juvenile facilities, all of which purportedly were in deplorable condition. Thus, in sum, the essentially uncontroverted factual record firmly establishes that Grant, through no fault of his own, was subjected during his entire childhood to poverty and parental neglect.
Perhaps the OCCA’s “matter of choice” statement was aimed more narrowly at Grant’s juvenile criminal activities,, rather than his entire childhood. But, even assuming that to be the case, the statement is clearly inconsistent with the more sympathetic views expressed by the Supreme Court regarding juvenile offenders. In Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), for example, the Supreme Court outlined “[tjhree general differences between juveniles under 18 and adults.” 543 U.S. at 569, 125 S.Ct. 1183. “First,” the Court stated, “as any parent knows and as the scientific and sociological studies ... tend to confirm, [a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous' and ill-considered actions and decisions.” Id. (internal quotation marks omitted). “The second area of difference,” the Court noted, “is that juveniles are more vulnerable or susceptible to negative influences and outsides pressures, including peer pressure.” Id. “This is explained in part,” the Court stated, “by the prevailing circumstance that juveniles have less control, or less■ experience with control, over their own environment.” Id. (emphasis added). “The third broad difference,” the Court explained, “is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed.” Id. at 570, 125 S.Ct. 1183. And the Court proceeded to note that juveniles’ “own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment.” Id. Consequently, the Court stated, “[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor’s character deficiencies will be reformed.” Id.

2) The OCCA’s second factual error

The second factual error made by the OCCA was its finding that Grant, as an adult, “had no meaningful contact with the family members who would have testified” on his behalf. Grant I, 58 P.3d at 800. Shortly after Grant turned eighteen (in 1979), he was convicted of a felony in Oklahoma state court and sentenced to a term of imprisonment. While he was confined, his mother, Ruth Grant, moved from Oklahoma City to Portland, Oregon, and most of Grant’s siblings moved with her. In 1980, Grant was released on parole, but soon thereafter committed several armed robberies in Oklahoma. Grant, who was then nineteen years of age, was convicted of those crimes in November 1980 and sentenced to a total term of imprisonment of 130 years in the custody of the Oklahoma Department of Corrections. Consequently, >it became difficult for Grant’s family, living in Oregon and of very mod *1036 est means, to personally visit him in prison in Oklahoma. Nevertheless, according to her testimony at the state evidentiary hearing, Ruth Grant returned to Oklahoma every year to visit Grant in prison (except for one year when Grant had been transferred to a facility in Texas). Ruth Grant further testified that she regularly wrote to Grant in prison, and that he had also written to her. At least four of Grant’s siblings (LaRonda Joy Hovis, Ruth Ann Grant Burley, Andrea Jean Grant, and O.C. Frazier) testified that they also corresponded with Grant in prison or talked to him by telephone. Lastly, Grant’s uncle, Clayton Black, testified that he visited Grant once or twice per year in prison, and would drive Grant’s mother to the prison for her annual visit with Grant. Thus, in sum, the evidentiary hearing record established that Grant had several family members, including his mother, who maintained regular contact with him.

3) The OCCA’s third factual error

The third factual error committed by the OCCA was its finding that the testimony of Grant’s family members “would have repeated Grant’s own account of his childhood.” Grant I, 58 P.3d at 800. Grant testified on his own behalf diming the sentencing-phase proceedings. During his testimony on direct examination, Grant noted that he had five brothers and three sisters and that he was “somewhere in between” in terms of his age. Trial Tr. at 1565. Grant did not testify at all regarding the events of his childhood from birth until age twelve. Instead, his testimony focused very briefly on the period of his life from age twelve, when he first left home, until age seventeen, when he left home for good. Grant testified that during that time period he got into trouble as a juvenile and was sent to different juvenile facilities. The remainder of Grant’s testimony on direct examination focused on his criminal activities as an adult and his purported lack of recollection of murdering Carter. Quite clearly, Grant’s testimony failed to provide the jury with any details of his childhood or the difficulties he faced as a child. Thus, contrary to the OCCA’s findings, the testimony of Grant’s family members would not simply have repeated Grant’s own account of his childhood, and instead could have provided the jury with important mitigating evidence.

h) The OCCA’s fourth factual error

The OCCA’s fourth factual error was its finding that the testimony of Grant’s family members “would have been cumulative to each other.” Grant I, 58 P.3d at 799. To be sure, there was some overlap in the testimony provided by Grant’s family members at the state evidentiary hearing. But a careful review of that testimony indicates that each of Grant’s family members provided specific details not testified to by anyone else. For example, LaRonda Joy Hovis, the oldest of Grant’s female siblings, was the only witness who specifically described the living conditions her family faced prior to their move to Oklahoma City. According to Hovis, her family (including at that time Grant’s father and two oldest brothers) lived in a three-room house in Ada, Oklahoma, that lacked plumbing. Another significant example came from the testimony of Grant’s younger sister, Andrea Jean Grant. She testified that, as a child, Grant stole in order to provide clothing and shoes for his younger siblings.

5) The OCCA’s fifth factual error

The fifth factual error committed by the OCCA was its finding that trial counsel’s “knowledge of Grant’s early life, through conversations with Grant, would not have been, enhanced by interviewing [Grant’s] family members.” Grant II, 95 P.3d at *1037 181. At no point during the state evidentiary hearing did Bowen, Grant’s lead trial counsel, testify that he spoke with Grant about the details of “Grant’s early life.” Nor did Bowen describe any of those details. Instead, Bowen’s testimony suggests that any facts he learned about Grant’s childhood came primarily, if not exclusively, from the defense’s guilt-phase expert witness, psychologist Dean Montgomery. And even those details, according to the trial transcript, were far from complete.[4] Thus, in short, there is no evidentiary basis to support the OCCA’s finding on this point.[5]

6) The OCCA’s sixth factual error

The sixth factual error committed by the OCCA was its finding that Bowen “followed the directions of his client” and did not contact Grant’s family members. Grant II, 95 P.3d at 181. During the state evidentiary hearing, Bowen testified that during their pretrial conversations, Grant “indicated ... that he really didn’t want his family to be involved.” Tr. of Evid. Hr’g, at 54. ' But Bowen proceeded to testify, “I don’t normally, I don’t take that into consideration what the Defendant in a Capital murder case wants with regard to those kind of issues. We would still follow-up as far as trying to find family and getting information independently.” Id. at 58. In other words, Bowen testified, Grant’s “reluctance about getting his family involved did not deter me from attempting to — from directing my investigator to attempt to contact his family.”[6] Id. at 61. And Bowen explained that he ultimately did not call any of Grant’s family members to testify during the sentencing-phase proceedings because “as hard as we [Bowen and his investigator] tried we" really couldn’t find them [Grant’s family members],” and because Grant “really hadn’t had any contact with them to speak of in over twenty years.” Id. at 56. But the record on appeal clearly 'indicates that both of these purported excuses are without support. In fact, Grant’s family was easy to locate using information culled from Grant’s prison records, and Grant’s family did have contact with him during the twenty-plus years he was imprisoned.

7) The OCCA’s resulting legal error

As I have noted, the OCCA ultimately concluded that Grant could not satisfy the first prong of the Strickland test because Bowen “made a reasonable decision that investigation into Grant’s family history by contacting family members was unneces *1038 sary.” Grant II, 95 P.3d at 181. But the above-outlined factual errors, upon which the OCCA’s legal conclusion was based, render the legal conclusion itself unreasonable. As noted, Bowen did not decide to forego investigation into Grant’s family history. Rather, he and his investigator were purportedly unable to locate any of Grant’s family members, even though Grant’s post-trial OIDS investigator had no problem locating Grant’s family members using the exact same information that was available to Bowen and his investigator prior to trial. And this failure to contact Grant’s family members left Bowen with insufficient information upon which to decide whether the testimony of Grant’s family members would be beneficial to Grant during the sentencing-phase proceedings. Moreover, to the extent Bowen based his decision not to call family members on Grant’s purported lack of contact with them, Bowen clearly lacked sufficient and accurate information on that issue. As previously discussed, several of Grant’s family members, most notably his mother, testified that they regularly visited or communicated with Grant in prison. Thus, in short, Bowen lacked sufficient information to make an informed and reasoned decision about what evidence to present or forego at the sentencing proceedings.

8) De novo review of the first prong of Strickland

Reviewing de novo the first prong of the Strickland test, it is clear, and the State effectively concedes, that Bowen’s performance was deficient. As the Supreme Court stated in Strickland and reemphasized in Wiggins, “strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.” Wiggins, 539 U.S. at 521, 123 S.Ct. 2527 (internal quotation marks omitted). In this case, the factual record fully exposes Bowen’s failure to conduct an adequate investigation of Grant’s family history, and thus he was completely unaware of critical mitigating information that Grant’s family members could have provided. Consequently, Bowen’s decision as to what evidence he would present during the sentencing-phase proceedings was in turn fundamentally flawed and cannot be labeled a “strategic choice.” As Judge Chapel aptly noted in Grant I, “counsel cannot ‘reasonably’ decide not to present a particular type of mitigating evidence ... if counsel does not first discover and develop such evidence to some degree, such that its potential impact can be understood and realistically evaluated.” Grant I, 58 P.3d at 803. Thus, as Judge Chapel further noted, Bowen “could not have reasonably decided that testimony from members of Grant’s family would not be helpful, unless he had first located and interviewed at least some of them.” Id. at 806. And Bowen’s failure in this regard is even more egregious in light of the fact that there appear to have been no other compelling mitigation strategies available to him. See Grant II, 95 P.3d at 189 (Chapel, J., dissenting) (noting that, unlike in Wiggins, Bowen could not have attempted to convince the jury in the sentencing-phase proceedings that Grant was not responsible for Carter’s murder, nor could Bowen point to Grant’s lack of a prior criminal history).

B. The prejudice prong of the Strickland test

That leaves the key question of whether Grant was prejudiced by the failure of his trial attorneys to investigate and present mitigating evidence from his family members. The OCCA purported to address this question on the merits in both Grant I and Grant II. In Grant I, the OCCA summarily concluded that “[e]ven if [Grant] *1039 had shown deficient performance, [he] could not show that he was prejudiced by the failure to present this evidence.” 58 P.3d at 800. In Grant II, the OCCA expanded slightly upon this conclusion, stating:
There is no indication that had the jury been confronted with the testimony of family members the result of this proceeding would have been different. The jury found the existence of three aggravating circumstances. Grant was incarcerated for committing violent crimes. He violently and repeatedly stabbed a civilian kitchen worker while he was serving a sentence for a violent crime. The testimony of Grant’s family members would not have swayed the. jury from imposing the death penalty.
95 P.3d at 181 (footnote omitted).
Like its analysis of Strickland’s first prong, however, the OCCA’s analysis of Strickland’s second prong was unquestionably impacted by its erroneous factual findings. Because the OCCA erroneously found that the testimony of Grant’s family members “would [simply] have repeated Grant’s own account of his childhood,” Grant I, 58 P.3d at 800, it is not surprising that the OCCA in turn concluded that Grant was not prejudiced by Bowén’s failure to present that testimony during the sentencing-phase proceedings. But, as I have already explained, the record on appeal firmly establishes that the testimony of Grant’s family members would have expanded greatly upon “Grant’s own account of his childhood.” Id. Because the OCCA fundamentally misunderstood, and effectively discounted, the mitigating testimony that could have been presented by Grant’s family members, the OCCA’s adjudication of the second prong of the Strickland test was “based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,” 28 U.S.C. § 2254(d)(2), and thus we are obligated to review that prong de novo. See Wilson v. Workman, 577 F.3d 1284, 1303 (10th Cir.2009) (reviewing de novo petitioner’s ineffective assistance claim after first determining that OCCA’s decision was based on an unreasonable determination of the facts).
In examining the constitutionality of capital sentencing proceedings, the Supreme Court has stated that “the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.” Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). This, the Court has held, ensures that “the sentence imposed at the penalty stage ... reflects] a reasoned moral response to the defendant’s background, character, and crime.” Abdul-Kabir v. Quarterman, 550 U.S. 233, 252, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007) (internal quotation marks and emphasis omitted). The Court has also emphasized that “[t]he need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases.” Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). That is because; the Court has explained, “[t]he nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence.” Id. - And, consistent with these principles, the Court has held that, “[i]n assessing prejudice” de novo, “we [must] reweigh the evidence in aggravation against the totality of available mitigating evidence.” Wiggins, 539 U.S. at 534, 123 S.Ct. 2527.
*1040 In conducting the mandated reweighing in this case, I agree with the following statement from Judge Chapel’s dissent in Grant II:
The question is not whether Grant’s background, family history, and some of his positive traits could excuse his cruel murder of Gay Carter. They certainly could not. The question is whether there is a “reasonable probability” that at least one juror — and it would only take one — could be sufficiently moved by the circumstances of Grant’s life to choose to spare that life from execution.
95 P.3d at 190.
Notably, Judge Chapel, in his dissent in Grant I, accurately described the mitigating testimony that Grant’s family members could have offered at the sentencing-phase proceedings:
The family members painted a rather depressing picture of the circumstances into which Grant was born and in which he grew up. John Marion Grant was the sixth of nine children and the last fathered by his mother’s former husband, Walter Grant.FN23 Walter left the family home in Ada, Oklahoma approximately one month before John was born, leaving Ruth with six children to raise on her own. Walter moved to Los Angeles and never provided any financial support to Ruth or the children. Although the two oldest brothers eventually went to live with Walter in Los Angeles, Grant was left in Oklahoma and had very little contact with his father while he was growing up.
During the three years following Walter’s departure and Grant’s birth, Ruth had three more children (Andrea, Gregory, and O.C.), the last of which was • named after their father, O.C. Frazier. O.C. Frazier never lived in Ruth’s home with the children, and John never experienced having a male role model in the family home. Instead, the two oldest sisters in the family were expected to play very substantial roles in running the home and raising and disciplining the younger children, including Grant, even while they were still children themselves.
Ruth’s only sources of income to support' her large family were Aid to Dependent Children and some part-time work cleaning people’s homes. LaRonda described their family as “dirt poor, extremely poor.” The first family home in Ada had only three rooms and no indoor plumbing, and the family did not own a car. When Grant was approximately five years old, the family moved to Oklahoma City, where they lived next door to Ruth’s brother, Clayton Black. Black lived across the street from some apartment buildings that were known as “the projects,” and Ruth and the children eventually moved into these apartments. Family members testified that things got even worse in the new neighborhood, which was poor, tough, crime-ridden, run down, and dangerous, particularly in the projects. In 1979, Ruth and the children who were still in the home moved to Portland, Oregon to escape the neighborhood. Grant was unable to go with the family, however, because he was confined to a juvenile facility at the time.
The family members described Grant as being “sweet,” “loving,” “quiet,” “sensitive,” and “gentle” when he was a child. He loved animals and pets, especially dogs. Some of Grant’s sisters testified that he did not get much attention from their mother and that he needed more love than he got. Many of the *1041 family members remembered Grant crying a lot as a child. Ruth noted that Grant first started having problems and getting into trouble when the city started busing the children to schools outside the neighborhood. Some of Grant’s siblings testified that when Grant first started stealing as an adolescent, he was stealing things like clothing and shoes for the younger children in the family.
Grant’s younger siblings testified that he was very protective of them and that he would come to the aid of his younger brothers when older boys in the neighborhood threatened them or tried to fight them. Gregory testified that Grant gave him “quite a bit of advice growing up” and that Grant attempted to steer him away from some of the “badder guys” in the neighborhood. He stated that even though Grant did not follow his own good advice, “he pretty much wanted to make sure that the people who were younger or his beloved brothers' didn’t get into the type of lifestyle he got into.” Andrea testified that Grant was her “favorite brother” and that they were very close as children. O.C. likewise described Grant as a “cool brother” who was always there for him and who helped him out a lot.
LaRonda testified that Grant once helped her escape from an abusive boyfriend and that she was very touched by the concern he showed for her and her children at that time. Gregory testified that Grant always loved small children, particularly his nieces and nephews. And all of the family members testified that Grant was never violent or verbally abusive within the family, even as an adolescent.
The family members also testified that they stilled loved Grant and that they would like the opportunity to maintain or renew their relationships with him. Some expressed regret about their failure to provide Grant with more support. All of the family members' testified that 'if they had been given the opportunity to testify at Grant’s trial, they would have asked the jury to spare his life.
Grant I, 58 P.3d at 807-08 (internal paragraph numbers omitted).
To be sure, none of this evidence would have squarely rebutted the three aggravating factors alleged by the prosecution and found by the jury. But a death sentence is not imposed simply by assessing the presence or absence of aggravating circumstances. The question of a defendant’s moral culpability, for example, is a factor that has been repeatedly emphasized by the Supreme Court as one that can “provide [a] jury with an entirely different reason for not imposing a death sentence.” Abdul-Kabir, 550 U.S. at 259, 127 S.Ct. 1654. And the Supreme Court has quite clearly held that a defendant’s “childhood deprivation,” id., or “troubled history,” Wiggins, 539 U.S. at 535, 123 S.Ct. 2527, is “relevant to assessing [his or her] moral culpability.” Id.
In Grant’s case, his jury, due to the decisions of his trial counsel, was given very little information about Grant’s background and character. The jury did not hear from, nor even see, Grant’s family members. The jury was truly left with the impression that no one cared whether Grant lived or died. Although Grant’s counsel urged the jury during sentencing-phase closing arguments to “look at ... Grant as something other than a monster,” Trial. Tr., Vol. VI at 1612, the jury in fact had no information that would have allowed it to do so. And the prosecution seized upon this lack of evidence during its sentencing-phase closing arguments, implying falsely that there was really no explanation for Grant’s criminal history other than his own conscious and knowing *1042 choices. Id. at 1608 (“He simply has chosen' not to abide by the rules that we all abide by.”), 1613 (“He’s chosen consciously to break the law and his history shows that pattern of decision after decision after decision .... He’s made bad choices. Some people just do that.”). As a result, Grant’s jury was in no position to adequately assess his moral culpability, nor in turn fully engage in what the Supreme Court has described as “the process of inflicting the penalty of death.” Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (internal quotation marks omitted).
Even if we assume, as the majority suggests, that the mitigating evidence that Grant’s family members would have provided is less persuasive than the “powerful” mitigating evidence at issue in Wiggins (which included “severe privation and abuse in the first six years of [Wiggins’s] life while in the custody of his alcoholic, absentee mother,” and “physical torment, sexual molestation, and repeated rape during his subsequent years,” Wiggins, 539 U.S. at 535, 123 S.Ct. 2527), I agree with Grant that Wiggins and cases like it “only give general guidance as to the types of evidence that constitute powerful and compelling mitigation evidence” and “which lessen the moral culpability of a capital defendant.” Aplt. Reply Br. at 14. As previously stated, federal law entitles every capital defendant to individualized sentencing. Lockett, 438 U.S. at 604-05, 98 S.Ct. 2954 (holding that individualized consideration of a capital defendant must take place to ensure the constitutional imposition of the death penalty).
Had Grant actually received the individualized consideration that the Constitution entitles him to, I believe that the testimony of Grant’s family members would have placed not only the murder, but Grant’s entire criminal history, into a different, and more sympathetic context for the jury. Specifically, the testimony of Grant’s family members suggests that Grant’s first forays into crime were a product of the difficult environment in which 'he and his siblings were living, which included a lack of even the most basic of life’s necessities. Indeed, the evidence suggests that Grant, who effectively acted as a caretaker for his younger siblings, began stealing to provide them with clothing and shoes. In turn, the testimony of Grant’s family members suggests that Grant’s experiences in juvenile facilities hardened him and likely lead to his committing crimes as a young adult. And, tragically, those crimes lead to him being sentenced at the age of nineteen to a life in prison. Of course, none of this evidence explains precisely why Grant killed Carter, nor does it excuse the murder. But, “[h]ad the jury been able to place [Grant’s] ... life history on the mitigating side of the scale,” I believe “there is a reasonable probability that at least one juror would have struck a different balance” and decided that life imprisonment was a sufficient penalty for the murder. Wiggins, 539 U.S. at 537, 123 S.Ct. 2527. Consequently, I conclude that Grant is entitled to federal habeas relief in the form of a new sentencing proceeding that satisfies the constitutional standards outlined by the Supreme Court.

. I would reject this proposition in any event because it fails to take into account the fact that Oklahoma state law imposes a duty on a trial court to instruct on any lesser-included offense supported by the evidence, regardless of whether the defendant requests such an instruction or not. Indeed, the OCCA acknowledged that very rule of state law in its decision denying Grant’s direct appeal. Grant v. State, 58 P.3d 783, 795 (Okla.Crim.App.2002) (“It is the trial court’s duty to instruct the jury on all lesser related offenses that are supported by the evidence, even absent a request from a defendant.’’). And the OCCA has continued to apply that rule in more recent cases. See Owens v. State, 229 P.3d 1261, 1266 (Okla.Crim.App.2010) (concluding that trial court had a duty to instruct on lesser included offense regardless of the parties’ requests, theories of prosecution or theories of defense).

. In reviewing the OCCA’s Strickland analysis, I have followed the guidance afforded us in Cullen v. Pinholster, - U.S. -, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011), by restricting my review to only the record that was before the OCCA when it resolved Grant’s ineffective assistance claim. Although I question whether I am bound to do so, I have also limited myself to the same record in conducting my de novo review of Grant's ineffective assistance claim. I note, however, that my conclusions would not change were I to include consideration of the mitigating evidence now cited by Grant that was not before the OCCA at the time of its decision.

. I recognize there is a circuit split regarding the precise interplay of 28 U.S.C. § 2254(d)(2), which provides that federal habeas relief can be granted in favor of a state prisoner on the basis of a claim that was adjudicated on the merits in state court proceedings if the state courts’ adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings,” and 28 U.S.C. § 2254(e)(1), which provides that in federal habeas proceedings brought under § 2254, "a determination of a factual issue made by a State court shall be presumed to be correct” and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.” See Wood v. Allen, 558 U.S. 290, 130 S.Ct. 841, 848 n. 1, 175 L.Ed.2d 738 (2010) (citing circuit cases that have addressed the issue). It is unnecessary for us to take a position on that issue in this case because, under any of the various formulations that have been employed by our sister circuits, the OCCA’s presumptively correct factual findings have been rebutted by clear and convincing evidence and proven, both individually and collectively, to be unreasonable.

. The majority also references Montgomery, albeit not by name but rather by the term “guilt stage expert,” and suggests that Montgomery “talked about [Grant’s] difficult childhood.” Maj. Op. at 1023. A careful examination of Montgomery’s testimony, however, indicates that he provided only minimal details about Grant’s childhood (e.g., the fact that Grant was the sixth of nine children and never really knew his father).

. Somewhat relatedly, Bowen's testimony at the state evidentiary hearing also established that he had a significant misunderstanding of how frequently Grant’s family members had contact with Grant in prison. For example, it was Bowen’s understanding that Grant’s mother "had come to see him just a few times while he was incarcerated.” Tr. of Evid. Etr’g, at' 55. But the record firmly establishes that Ruth Grant visited Grant on an annual basis (with the exception of one year when he was confined in a facility in Texas).

.The state trial court expressly found, after hearing this testimony, that Grant did not waive the presentation of mitigating evidence from his family members. And, as Judge Chapel aptly noted in his dissent, “[t]he record suggests that rather than deciding not to pursue mitigating evidence about Grant's early life from members of his family, Grant’s counsel recognized that such information was relevant and potentially helpful, he just never accomplished the task of actually obtaining it.” Grant II, 95 P.3d at 188.

. The children born to Ruth and Walter Grant, in the order of their birth, were Kenneth, Ronnie, LaRonda, Ruth Ann, Norman, and John.